IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTOINETTE GONZALES, CAROLL AUSTIN,
SARAH CLOVER, ANNETTE MORA,
JAMES PRESCETTI, YOLANDA GARCIA,
NICOLE FOSTER, NICOLE BORDLEMAY,
KARI WAITES, and A CLASS OF SIMILARLY
SITUATED CITY EMPLOYEES,

        Plaintiffs,

vs.                                                                          No. CIV 09-0520 JB/RLP

THE CITY OF ALBUQUERQUE, ED
ADAMS, Chief Administrative Office, and
ESTHER TENENBAUM, Division Manager,
in their individual and official capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed June 6, 2010 (Doc. 56). The Court held a hearing on January 10, 2010. The primary issues are: (i) whether the Plaintiffs have established a genuine issue of material fact on their due-process claims; (ii) whether the Plaintiffs have established a genuine issue of material fact on their breach-of-contract claims; (iii) whether the Plaintiffs have established a genuine issue of material fact on their wrongful termination claims; (iv) whether the Plaintiffs have established a genuine issue of material fact on their Family and Medical Leave Act, 29 U.S.C. §§ 2601 through 2654 ("FMLA"), claims; (v) whether Plaintiff Antoinette Gonzales has established a genuine issue of material fact on her Fair Labor Standards Act, 29 U.S.C. §§ 201 through 219 ("FLSA"), claim; and (vi) whether the Court should grant declaratory judgment on the issue whether the Plaintiffs had a protected property interest in their continued employment. The Court will grant in part and deny

in part the Defendants' Motion for Summary Judgment.  The Court will grant summary judgment on the Plaintiffs' due-process claims, because it finds that the Plaintiffs did not have protected property interests in continued employment.  The Court will grant summary judgment on the Plaintiffs' breach-of-contract claims, because it finds that the Plaintiffs have not established a genuine issue of fact whether they had implied employment contracts.  The Court will grant summary judgment on the Plaintiffs' wrongful termination claims, because the Plaintiffs have not established an issue of fact whether they were discharged in violation of a clear mandate of public policy.  The Court will grant summary judgment on the Plaintiffs' FMLA claims.  Assuming that the Plaintiffs' FMLA claims are retaliation claims, the Court will grant summary judgment on their claims, because some of the Plaintiffs cannot establish a prima-facie case for FMLA retaliation, and because, although some of the Plaintiffs can establish a prima-facie case for FMLA retaliation, the Defendant City of Albuquerque ("the City of Albuquerque") has set forth a legitimate non-retaliatory reason for the Plaintiffs' terminations, and those Plaintiffs have not established a genuine issue of fact whether that reason is pretextual.  Assuming that the Plaintiffs' FMLA claims are interference claims, the Court will grant summary judgment on those claims, because the Plaintiffs have not established a genuine issue of fact whether the City of Albuquerque interfered with their rights to take FMLA leave.  The Court will not grant summary judgment on Gonzales' FLSA claim, because Gonzales has established a genuine issue of material fact whether she falls within the executive exemption.  The Court will deny the Plaintiffs' request that it enter declaratory judgment, because it finds that the Plaintiffs did not have a protected property interest in their continued employment, and it will grant summary judgment on the Plaintiffs' declaratory judgment claims.

## **FACTUAL BACKGROUND**

The City of Albuquerque is a municipality and public employer.  See, e.g., Complaint ¶ 3,

at 2 , filed May 27, 2010 (Doc. 1-1); Defendants' Amended Memorandum of Law in Support of Their Motion for Summary Judgment ¶ 2, at 2, filed July 27, 2010 (Doc. 65)("Amended Memorandum")(setting forth this fact); Plaintiffs' Response to Defendants' Motion for Summary Judgment at 2, filed September 7, 2010 (Doc. 71)("Response")(not controverting this fact). Defendant Ed Adams is the former Chief Administrative Officer ("CAO") for the City of Albuquerque. See Complaint ¶ 3, at 2; Deposition of Esther Tenenbaum at 123:4-5, 123:10-11 (taken January 12, 2010), filed July 27, 2010 (Doc. 65-3); Amended Memorandum ¶ 2, at 2 (setting forth this fact); Response at 2 (not controverting this fact).

Gonzales and Plaintiffs Nicole Bordlemay, Nicole Foster, Yolanda Garcia, James Pescetti, Caroll Austin, Annette Mora, Sarah Clover, and Keri Waites are former employees of the City of Albuquerque's 311 Citizen Contact Center ("311 CCC").[1] See, e.g., Complaint ¶ 1, at 1, filed May 27, 2009 (Doc. 1-1); Amended Memorandum ¶ 1, at 1 (setting forth this fact); Response at 2 (not controverting this fact). Gonzales was a salaried supervisor at the end of her tenure with the 311 CCC, while the other eight Plaintiffs were hourly employees. See, e.g., Deposition of Antoinette Gonzales at 31:6-32:4 (taken October 13, 2010), filed July 27, 2010 (Doc. 65-1); Complaint ¶ 1, at 1; Amended Memorandum ¶ 1, at 1-2 (setting forth this fact); Response at 2 (not controverting this fact). Defendant Esther Tenenbaum is the 311 CCC Division Manager. See Complaint ¶ 3, at 2; Amended Memorandum ¶ 2, at 2 (setting forth this fact); Response at 2 (not controverting this fact).

---

[1] The 311 CCC handles calls from citizens of the City of Albuquerque who call 311. See Gonzales v. City of Albuquerque, No. CIV 09-0520, 2010 WL 4053947, at *1 (D.N.M. Aug. 21, 2010)(Browning, J.)(citation omitted). The 311 service is a single telephone number for all non-emergency City of Albuquerque inquiries and services. See 2010 WL 4053947, at *1 (citation omitted).

-3-

1.      **311 CCC Employees.**

Section 3-1-6 of the City of Albuquerque's Merit System Ordinance provides in relevant part that the "unclassified service" shall be comprised of "any position designated as unclassified by the Chief Administrative Officer."  Merit System Ordinance § 3-1-6(C)(9), filed July 27, 2010 (Doc. 65-4).  See Amended Memorandum ¶ 3, at 2 (setting forth this fact); Response at 2 (not controverting this fact).  "Unclassified employees are employees at will and serve at the discretion of the [CAO] . . . .  Such employees shall have no property interest in continued unclassified employment and may be dismissed for any or no reason."  Merit System Ordinance § 3-1-6(D). See Amended Memorandum ¶ 5, at 2 (setting forth this fact); Response at 3 (not controverting this fact).

All employees of the 311 CCC are unclassified under the City of Albuquerque's Merit System.[2]  See, e.g., Mora's City of Albuquerque Recommendation for Hire/Promotion Form at 1;

_____

[2] In their undisputed facts, the Defendants assert that all employees of the 311 CCC are, and at all relevant times have been, "unclassified" under the City of Albuquerque's Merit System Ordinance.  See Amended Memorandum ¶ 3, at 2 (citing Tenenbaum Depo. at 36:19-37:6, 37:20-21 ("I was advised that all of 311 was going to be unclassified. . . .  When I came on the board, I was told that all of 311 was unclassified")).  In response to this proposed undisputed fact, the Plaintiffs stated:

> The City's support for this contention is based on . . . Tenenbaum's recollection of what her predecessor told her.  Asked what she knows 'about the origin of the unclassified nature of 311 operators' her answer was "When I came on the board, I was told that all of 311 was unclassified.  That's the depth of my knowledge."
>
> The City's Merit System Ordinance's provision allowing the CAO to declare employees 'unclassified' is a catch-all that excludes from the Merit System any employees deemed unclassified by the CAO.  Surely a material fact, which the City has failed to produce, would be a document, declaration, or at least a formal statement, . . . enacting such an important exemption from the Merit System . . . .  While it may be true that all 311-CCC employees have been treated as "unclassified" from the start, that is far from substantial evidence that they have ever properly been

deemed "unclassified" and excluded from the City's civil service, or that there was
a valid reason to exclude them.

Response at 2-3. The Plaintiffs also assert that Tenenbaum's testimony is hearsay. See Response
at 12. A statement is hearsay if it is one "other than one made by the declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid.
801(c). The statements to Tenenbaum that all 311 CCC employees were unclassified are hearsay.
The Court will therefore not consider Tenenbaum's testimony for the truth of the matter asserted.
See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this
circuit that we can consider only admissible evidence in reviewing an order granting summary
judgment. Hearsay testimony cannot be considered because [a] third party's description of [a
witness'] supposed testimony is not suitable grist for the summary judgment mill." (internal
quotations and citations omitted)). The Court can, however, consider the statement for its impact
on Tenenbaum's state of mind and for that limited purpose only.

There is, however, evidence in the record that supports the Defendants' asserted fact. The
Merit System Ordinance states that the CAO can designate any position as unclassified. See Merit
System Ordinance § 3-1-6(C)(9)("The unclassified service shall be comprised of the
following: . . . Any position designated as unclassified by the [CAO]."). The portions of the Merit
System Ordinance that the parties provided to the Court do not state how the CAO must designate
employees as unclassified, such as through a form or through a formal declaration, proclamation or
order. It therefore appears that the CAO can designate employees as unclassified in the manner
which he chooses.

There is evidence in the record that former CAO James B. Lewis or Bruce Perlman
designated Mora, Clover, Bordlemay, Foster, Garcia, and Pescetti as unclassified. See City of
Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc. 65-
8)(recommending that Mora be hired as an unclassified employee and signed by the CAO); City of
Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc. 65-
12)(recommending that Clover be hired as an unclassified employee and signed by the CAO); City
of Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc. 65-
14)(recommending that Bordlemay be hired as an unclassified employee and signed by the
CAO); City of Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc.
65-16)(recommending that Foster be hired as unclassified and signed by the CAO); City of
Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc. 65-
18)(recommending that Garcia be hired as unclassified and signed by the CAO); City of
Albuquerque Recommendation for Hire/Promotion Form, filed July 27, 2010 (Doc. 65-
20)(recommending that Pescetti be hired and signed by the CAO). Furthermore, there is evidence
that the CAO designated Mora, Austin, Clover, Bordlemay, Foster, Garcia, and Pescetti as
unclassified, because they all signed Employment Information Forms, which stated that their
employment status was unclassified. See, e.g., City of Albuquerque Employment Information Form
at 1, filed July 27, 2010 (Doc. 65-8)(stating that Mora's employment status was
unclassified)("Mora's Employment Information Form").

Although the Defendants did not submit Gonzales' and Waites' Recommendation for
Hire/Promotion Forms, Gonzales testified that she was informed that she was unclassified at the new

-5-

Clover's City of Albuquerque Recommendation for Hire/Promotion Form at 1; Bordlemay's City

hire training for the 311 CCC, and Waites testified that, when she began working at the 311-CCC, she signed a document stating that her employment status was unclassified.  See Gonzales Depo. at 13:11-15:8 (stating that, at the new-hire training for 311 CCC employees that Gonzales attended, Mike Padilla, a director of the 311 CCC, explained that 311 CCC employees were unclassified); Deposition of Keri Waites at 19:10-20:10 (taken May 4, 2010), filed July 27, 2010 (Doc. 65-6)(stating that she signed a document which stated her employment status was unclassified when she began to work at 311 CCC).  The Plaintiffs did not object, under the best-evidence rule, to the Defendants' use of Waites' testimony to prove that the CAO designated her as unclassified. The best-evidence rule states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." Fed. R. Evid. 1002.  The Court does not believe, however, that the best-evidence rule mandates that it not consider Waites' testimony in support of the Defendants' asserted fact.  The testimony or a copy is admissible to prove the content of a writing if the original is not available.  See Fed. R. Evid. 1003.  The Plaintiffs may not have objected to this testimony because everyone knows that the documents do not exist.  In any case, without objection, the Court therefore finds that the best-evidence rule does not limit admissibility of Waites' testimony.

Furthermore, there is evidence in the record that the CAO designated the positions at the 311 CCC as unclassified when the 311 CCC was created.  In their Reply, the Defendants asserted additional evidence in support of this asserted fact.  They submitted the declaration of Darlene Herrera, the Manager of Classification and Compensation in the Human Resources Department for the City of Albuquerque.  In her declaration, Herrera states:

> The Chief Administrative Officer ("CAO") must also approve all new positions and their status, grade, and classification. . . . [The documents attached to the declaration -- titled Position Control Forms (B-3)] created the positions of Citizen Contact Agent I and II, and Supervisor, at the newly created 311 [CCC].  The Position Control Forms show that these positions were created as unclassified positions. . . .  The CAO, James B. Lewis, approved the creation of the positions as unclassified when he executed the B-3 Forms . . . .

Declaration of Darlene Herrera ¶¶ 3-6, at 1 (executed October 12, 2010), filed October 15, 2010 (Doc. 79-2).  The Plaintiffs did not contest Herrera's declaration in the hearing on the Defendants' Motion for Summary Judgment.  Attached to Herrera's declaration are three Position Control Forms that the CAO signed, which created twenty-two citizen contact agent I unclassified positions, twenty citizen contact agent II unclassified positions, and four unclassified supervisor positions. See Position Control Form (B-3), filed October 15, 2010 (Doc. 79-2, Ex. A); Position Control Form (B-3), filed October 15, 2010 (Doc. 79-2, Ex. B); Position Control Form (B-3), filed October 15, 2010 (Doc. 79-2, Ex. C).  The Plaintiffs were supervisors, or citizens contact agents I or II, at the 311 CCC.  There is evidence that the CAO designated 311 CCC employees as unclassified employees.  The Plaintiffs have not introduce evidence controverting this evidence.  The Court will therefore accept as undisputed the Defendants' asserted fact.

of Albuquerque Recommendation for Hire/Promotion Form at 1; Foster's City of Albuquerque Recommendation for Hire/Promotion Form at ; Garcia's City of Albuquerque Recommendation for Hire/Promotion Form at 1; Pescetti's City of Albuquerque Recommendation for Hire/Promotion Form at 1; Position Control Form (B-3), Ex. A; Position Control Form (B-3), Ex. B; Position Control Form (B-3), Ex. C; Mora's Employment Information Form at 1; City of Albuquerque Employment Information Form at 1, filed July 27, 2010 (Doc. 65-10)(stating that Austin's employment status was unclassified, and containing Austin's signature)("Austin's Employment Information Form"); City of Albuquerque Employment Information Form at 1, filed July 27, 2010 (Doc. 65-12)(stating that Clover's (formerly Broyles') employment status was unclassified and containing Clover's signature)("Clover's Employment Information Form"); City of Albuquerque Employment Information Form at 1, filed July 27, 2010 (Doc. 65-14)(stating that Bordlemay's employment status was unclassified and containing Bordlemay's signature)("Bordlemay's Employment Information Form"); City of Albuquerque Employment Information Form at 1, filed July 27, 2010 (Doc. 65-16)(stating that Foster's employment status was unclassified and containing Foster's signature)("Foster's Employment Information Form"); City of Albuquerque Employment Information Form at 1, filed July 27, 2010 (Doc. 65-18)(stating that Garcia's employment status was unclassified and containing Garcia's signature)("Garcia's Employment Information Form"); City of Albuquerque Employment Information Form, filed July 27, 2010 (Doc. 65-20)(stating that Pescetti's employment status was unclassified and containing Pescetti's signature)("Prescetti's Employment Information Form"); Gonzales Depo. at 13:11-15:8 (stating that, at the new-hire training for 311 CCC employees that Gonzales attended, Padilla explained that 311 CCC employees were unclassified); Waites Depo. at 19:10-20:10 (stating that she signed a document which stated her employment status was unclassified when she began to work at 311 CCC).  When the 311 CCC

was first created, the City of Albuquerque decided that the 311 CCC employees would be unclassified.[3]  See Herrera Decl. ¶ 7, at 1-2.  The City of Albuquerque believed this status would allow the facility to operate like a private facility relative to wages, benefits, employee incentives, hiring, and discipline procedures.  See Herrera Decl. ¶ 7, at 1-2; Tenenbaum Depo. at 33:14-24.[4]

───────────────

[3] The Defendants assert that, when the 311 CCC was first created, the City of Albuquerque decided that all 311 CCC employees would be unclassified.  See Amended Memorandum ¶ 4, at 2 (citing Tenenbaum Depo. at 36:19-37:6, 37:20-21 ("I was advised that all of 311 was going to be unclassified. . . . When I came on the board, I was told that all of 311 was unclassified")).  In their Response, the Plaintiffs state that Tenenbaum's testimony is hearsay and that Tenenbaum does not have personal knowledge.  See Response at 3 ("Again, the City refers to . . . Tenenbaum's hearsay without acknowledging that she has no personal knowledge whatsoever about what 'the City decided' when it was creating the 311-CCC resource.").  As the Court has discussed, Tenenbaum's testimony regarding what she was told is hearsay if what she was told is offered for the truth of the matter asserted, and the Court will not consider this evidence for the truth of the matter asserted. In their Reply, however, the Defendants asserted additional evidence in support of this asserted fact. They submitted Herrera's declaration.  In her declaration, Herrera states:

> I attended meetings in my official capacity at which the creation of the 311 CCC and the classification of its employees was discussed by those present, including myself. It was agreed by those present that the 311 CCC employees should be unclassified to allow the City the flexibility to operate the Center like a private facility relative to wages, benefits, employee incentives, hiring, and discipline procedures in order to provide optimum service to the citizens of Albuquerque.

Herrera Decl. ¶ 7, at 1-2 (executed October 12, 2010), filed October 15, 2010 (Doc. 79-2).  The Plaintiffs did not contest Herrera's declaration in the hearing on the Defendants' Motion for Summary Judgment.  Moreover, an agreement would not be hearsay.  Because this evidence supports the Defendants' asserted fact, and because the Plaintiffs have not controverted this evidence, the Court will treat this asserted fact as undisputed.  See D.N.M.LR-Civ 56.1(b).

[4] The Defendants assert that hiring unclassified employees allowed the 311 CCC to operate as closely as possible to a high-level private call center.  See Amended Memorandum ¶ 6, at 2 (citing Defendants' Second Supplemental Answer to Plaintiffs' Class Action Interrogatories, Nos. 7, 14-16, at 11, 16-20, filed July 27, 2010 (Doc. 65-5)("Answers to Interrogatories"); Tenenbaum Depo. at 33:8-36:12, 63:11-34:5). In response to this proposed undisputed fact, the Plaintiffs state: "[T]he City [asserts the fact] without attribution" and documentary support.  Response at 3.  In her deposition, Tenenbaum testified:

> If we were in a classified role, we would have had to continued to tolerate [disrespectful] behavior, which impacts the reputation of the City . . . , until all the

> processes were completed.  When there's an infraction in an unclassified role, we
> can sit down and have a discussion and try and change that behavior immediately so
> that it doesn't continue to impact anybody until a hearing or processes take place.

Tenenbaum Depo. at 33:14-24.  She also testified that she was told that, if the 311 CCC employees
were classified, they would not get paid as much.  See Tenenbaum Depo. at 63:25-64:5.

The Defendants also cite their Answers to Interrogatories in support of their asserted fact.
The Answers to Interrogatories stated:

> Employees in the 311 CCC are unclassified to allow the facility to be operated as
> closely as possible to a high-level private call center.  Unclassified status allows the
> City flexibility in wages and benefits by enabling it to provide wages, benefits, and
> incentives beyond or different from those applicable to classified City employees.
> The City is able to tailor specific employee incentives such as spot bonuses, awards,
> and social events to reward performance on an immediate or very prompt basis to
> motivate employees.

Answers to Interrogatories Nos. 7, 14, 15, 16, at 11, 16, 18, 19.  The portions of the Answers to
Interrogatories that the Defendants provided to the Court do not set forth who verified the answers.

> Answers to interrogatories must meet the requirement of Rule 56(e) that evidence
> offered in opposition to a motion for summary judgment must be made on personal
> knowledge . . . set forth such facts as would be admissible in evidence, and . . . show
> affirmatively that the [person who responded to the interrogatories] is competent to
> testify to the matters set forth therein.

Gross v. Burggraf Const. Co., 53 F.3d at 151 (quoting H.B. Zachry Co. v. O'Brien, 378 F.2d 423,
425 (10th Cir.1967))(internal citations omitted).  Because the Plaintiffs object to these answers and
because it is not apparent that the answers are based on a person's personal knowledge, or that the
person who responded to the interrogatories is competent to testify to those matters, the Court will
not consider the Answers to Interrogatories as evidence in deciding the Defendants' Motion for
Summary Judgment.

The Court believes that Tenenbaum's testimony regarding how the employees' unclassified
status allowed supervisors to address infractions immediately provides some support for the
Defendants' assertion that the employees' unclassified status allowed the 311-CCC to operate like
a private facility.  Tenenbaum's testimony regarding what she was told regarding the effect that
classification would have on 311 CCC employees' salaries, however, is hearsay to the extent what
she was told is offered for the truth of the matter asserted.  See Fed. R. Evid. 801.  The Court will
therefore not consider this evidence for the truth of the matter asserted.

Attached to their Reply, the Defendants provided evidence supporting this asserted fact in
the form of Herrera's declaration, which stated that the City of Albuquerque made the 311 CCC
employees unclassified "to allow the City flexibility to operate the Center like a private facility
relative to wages, benefits, employee incentives, hiring, and discipline procedures."  Herrera Decl.

The CAO designated positions at the 311 CCC as unclassified, as was within his discretion.[5]

See Adams Decl. ¶ 3, at 2.

311 CCC employees handle calls from citizens of the city of Albuquerque who call 311.[6]

_____

¶ 7, at 1-2.  The Plaintiffs did not address or controvert this evidence in the hearing.  The Court believes that this evidence, which is not controverted, supports the Defendants' asserted fact, and will therefore consider this asserted fact undisputed.  See D.N.M.LR-Civ 56.1(b).

[5] In their Amended Memorandum, the Defendants cite to Tenenbaum's testimony as support for this asserted fact.  In her deposition, Tenenbaum testified that she was told that all of 311 was unclassified.  See Tenenbaum Depo. at 36:24-37:21.  The Plaintiffs state that, although the City of Albuquerque relies on Tenenbaum's statements in her deposition to support its proposed undisputed fact, it ignores that Tenenbaum also stated in her deposition that the depth of her knowledge regarding the status of 311 CCC employees is what she was told when she came on the board.  See Response at 3.  As the Court has explained, the statement to Tenenbaum that all of 311 was unclassified is hearsay, and it will not consider this evidence as proof of the truth of the matter asserted.  Along with their Reply, however, the Defendants also submitted a declaration of the former CAO, which states that he, as the CAO, designated 311 CCC employees as unclassified.  See Declaration of Ed Adams ¶ 3, at 1 (executed October 14, 2010), filed October 15, 2010 (Doc. 79-1).  The Plaintiffs have not specifically controverted this evidence.  The Court will therefore consider this asserted fact undisputed.  See D.N.M.LR-Civ 56.1(b).

[6] In paragraph 9 of the Amended Memorandum, the Defendants assert:

Employees of the 311 CCC handle calls from citizens of the City who call 311.  311 CCC employees must be familiar with all operations and services across City departments, whereas other City employees' work, including those of other call center employees, does not require such a breadth of knowledge.  Unclassified 311 CCC employees are in fact paid more than classified employees in other City call centers.  Id.; E. Tenenbaum Depo. 35, 63-64.  Were 311 CCC employees classified, the City would not have the flexibility that it currently has to run the Center, including by compensating 311 CCC employees at a higher level than other City employees.

Am. Mem. ¶ 9, at 3 (citing Answers to Interrogatories Nos. 7, 14-16, at 11, 16-20; Tenenbaum Depo. at 35, 63-64).  The Plaintiffs object to the Defendants' asserted undisputed facts in paragraph 9 of their Amended Memorandum.  The Plaintiffs state: "Even though . . . Tenenbaum was required to testify on the basis of personal knowledge, it is again apparent that all she knows about the reasons for making 'nonclassified, nonunion positions' is that 'I was told that by Michael Padilla.'" Response at 5 (citing Tenenbaum Depo. at 63:11-17).  The Plaintiffs assert that, because Tenenbaum lacks personal knowledge regarding the reasons for the determination that 311-CCC employees would be unclassified, the Court should not consider her testimony.  See Response at 5.  In her

-10-

See Tenenbaum Depo. at 34:22-35:5; Amended Memorandum ¶ 9, at 3 (setting forth this fact);

Response at 4 (not controverting this fact).  With unclassified employees, 311 CCC supervisors can

use streamlined procedures to discipline or address employee infractions.  See Tenenbaum Depo.

at 33:14-34:11.  This flexibility is needed, because of the unique aspects of the work performed at

the 311 CCC.[7]  See Tenenbaum Depo. 33:14-36:12.

_____

deposition, Tenenbaum testified that employees at the 311 CCC answer telephone calls from
citizens.  See Tenenbaum Depo. at 35:2-12.  This testimony is not hearsay and is based on her
personal knowledge as a supervisor.  This evidence supports the Defendants' asserted fact that 311
CCC employees answer telephone calls from citizens.  Because the Plaintiffs have not controverted
this fact, the Court will treat this asserted fact as undisputed.  See D.N.M.LR-Civ 56.1(b).

The other testimony to which the Defendants cite in support of their asserted fact is
Tenenbaum's testimony.  In response to a question in which counsel asked Tenenbaum whether she
was "aware of an explanation that was given to some of the operators, contact agents, that the reason
they were unclassified was because they were receiving higher wages and benefits than other City
employees and that if they made them classified, they would lose those" higher wages, Tenenbaum
stated that Mike Padilla told her that.  Tenenbaum Depo. at 63:11-64:5.  It is unclear whether
Tenenbaum knew this information absent Padilla's statement, but to the extent that Tenenbaum's
testimony is that Padilla told her that unclassified employees received higher wages, the testimony
is hearsay, and the Court will not consider the statements for the truth of the matter asserted.  As the
Court has previously discussed, it will not consider the Answers to Interrogatories as evidence,
because there is no evidence in the record that the statements were made on the basis of personal
knowledge or that a person is competent to testify as to the matters set forth therein.  Because the
Court will not consider the Answers to Interrogatories as evidence supporting their asserted facts,
and because the Court will not consider the testimony in Tenenbaum's deposition regarding what
she was told for the truth of the matter asserted, the evidence in the record does not support the rest
of the Defendants' asserted facts in paragraph 9.  The Court will therefore not consider these
asserted facts.

[7] In paragraphs 7 through 8 of the Defendants' Amended Memorandum, the Defendants
assert:

> Unclassified status allows the City flexibility in wages and benefits by enabling it to
> provide wages, benefits, and incentives beyond or different from those applicable to
> classified City employees.  The City is able to tailor specific employee incentives
> such as spot bonuses, awards, and social events to reward performance on an
> immediate or very prompt basis to motivate employees.
>
> These incentives would not be possible under City rules and regulations
> applicable to classified employees.  The City can also use streamlined procedures as

appropriate which permit the hiring and discipline of employees on an expedited basis. This flexibility is needed because of the unique aspects of the work performed at the 311 CCC.

Amended Memorandum at 3 (internal citations omitted). The Defendants use an Id. citation to support these assertions, but it is unclear to which citation the Id. refers, as two citations precede the Id. citations -- the Answers to Interrogatories and Tenenbaum's deposition. Because these asserted facts are taken directly from the Answers to Interrogatories, the Court believes that the Id. citation is meant to refer to that source.

The Plaintiffs dispute the asserted facts in paragraphs 7 and 8 in Defendants' Amended Memorandum. See Response at 3-4. The Plaintiffs state the "City's references to justifications for making [the] Plaintiffs' [sic] 'unclassified' are to" their answers to interrogatories and Tenenbaum's deposition. Response at 4. The Plaintiffs state that the City of Albuquerque's statements about what it decided are "not attributed to any person and have no documentary support." Response at 4. The Plaintiffs contend that Tenenbaum's knowledge about the origins and philosophies behind the establishment of the 311 CCC is "nonexistent." Response at 4. "The interrogatory answers that refer to . . . the 311 program and the justification for making its employees 'unclassified' are not supported by any fact and are verified only by . . . Tenenbaum, who has conceded her lack of personal knowledge about anything that happened before she was hired at the 311-CCC." Response at 4.

As the Court has previously stated, because there is no evidence in the record that indicates that the statements in the Answers to Interrogatories were made on the basis of personal knowledge and that a person is competent to testify to the matters set forth therein, such as the signature of the person who gave the Defendants' counsel the information for the answers, the Court will therefore not consider these statements. See Gross v. Burggraf Const. Co., 53 F.3d at 151. It is possible that the Defendants meant to cite to Tenenbaum's deposition as support for these asserted facts. In her deposition, Tenenbaum testified that, if the contact agents were classified, the 311 CCC "would have had . . . to tolerate [disrespectful] behavior, . . . until all the processes were completed," but when an unclassified employee commits an infraction, the supervisors "can sit down and have a discussion and try and change that behavior immediately so that it doesn't continue to impact anybody until a hearing or processes take place." Tenenbaum Depo. at 33:11-24. Tenenbaum testified that this ability to immediately discuss infractions is necessary for the 311 CCC, because the 311 CCC helps citizens get what they need in a professional manner, and quality in communication is very important. See Tenenbaum Depo. at 33:20-36:12. Because this testimony supports the Defendants' assertions that, with unclassified employees, 311 CCC supervisors can use streamlined procedures to discipline or address employee infractions and that this flexibility is needed because of the unique aspects of the work performed at the 311 CCC, and because the Plaintiffs have not controverted this evidence, the Court will consider these asserted facts in deciding the Defendants' Motion for Summary Judgment.

In her deposition, Tenenbaum also testified that she was told that the 311 CCC employees were unclassified, because they received higher wages than classified employees, and if they were unclassified, they would lose their higher wages. See Tenenbaum Depo. at 63:11-64:5. The Court will not use this testimony to prove the truth of the matter asserted, because to the extent the

2.      **The Plaintiffs' Employment at the 311 CCC**.

a.      **Gonzales**.

The 311 CCC employed Gonzales from March 2004 until September 2008.  See Gonzales

Depo. at 11:15-19; Amended Memorandum ¶ 10, at 3 (setting forth this fact); Response at 5 (not

controverting this fact).  During her tenure at the 311 CCC, Gonzales was promoted from the

position of agent to supervisor.  See, e.g., Gonzales Depo. at 31:6-17; Amended Memorandum ¶ 11,

at 4 (setting forth this fact); Response at 5 (not controverting fact).  The 311 CCC supervisor job

description -- which states that a 311 CCC supervisor must: (i) supervise the activities of the 311

CCC and offer technical assistance to ensure effective operation; (ii) plan and organize to meet

production requirements; (iii) handle difficult calls to ensure the most effective procedures are

implements; (iv) monitor the productivity and performance of the 311 CCC; (v) conduct

performance and quality monitoring and auditing; (vi) produce performance and quality metric

analyses and reports; and (vii) create/execute plans for performance and quality improvement --

accurately reflects Gonzales' duties in that position.  See, e.g., Gonzales Depo. 64:16-65:5; City of

Albuquerque Job Description for Citizen Contact Supervisor at 1-3, filed July 27, 2010 (Doc. 65-2);

Amended Memorandum ¶ 11, at 4 (setting forth this fact); Response at 5 (not controverting this

fact).

As a supervisor, Gonzales was a salaried employee who made approximately $45,000.00 a

---

statement is offered for the truth of the matter asserted, the testimony is hearsay.  See Fed. R. Evid.
801.  Because the Court will not consider the Answers to Interrogatories, because there is no
evidence in the record that indicates that the statements in the Answers to Interrogatories were made
on the basis of personal knowledge and that a person is competent to testify to the matters set forth
therein, or the hearsay evidence for the truth of the matter asserted, it finds that the evidence in the
record does not support these other facts that the Defendants' asserted in paragraphs 7 and 8 of their
Amended Memorandum.  The Court will therefore not consider these asserted facts.

year when she was promoted and $50,000.00 at the end of her employment.  See, e.g., Gonzales

Depo. at 31:6-32:4; Amended Memorandum ¶ 12, at 4 (setting forth this fact); Response at 5 (not

controverting this fact).  When Gonzales was an agent, she earned approximately $17.00 an hour --

approximately $35,360 annually, based on 2080 hours.  See, e.g., Gonzales Depo. at 31:11-17;

Amended Memorandum ¶ 12, at 4 (setting forth this fact); Response at 5 (not controverting this

fact).  As a supervisor, Gonzales was responsible for the performance of a team of 311 CCC contact

agents; she supervised approximately ten to fifteen employees when she worked the day shift, and

three to four people when she worked the graveyard shift.  See, e.g., Gonzales Depo. at 37:20-24,

49:9-19; Amended Memorandum ¶ 13, at 4 (setting forth this fact); Response at 5 (not controverting

this fact).   311 CCC supervisors are responsible for coaching and leading their teams, for

disciplining and reviewing their team, and for ensuring adherence to City policy, but Gonzales did

not have a role in hiring or firing employees or in recommending an employees' termination.[8]  See,

---

[8] The Defendants assert: "All 311 CCC supervisors, including Gonzales, are responsible for coaching and leading their teams, making hiring decisions, making recommendations for dismissals, ensuring adherence to City policy, and disciplining and reviewing their team."   Amended Memorandum ¶ 14, at 4 (citing Tenenbaum Depo. at 48, 50, 131-32; Waites Depo. at 22-24).  The Plaintiffs dispute this asserted fact, directing the Court's attention to Gonzales' Affidavit, which gives a description of her job duties as a supervisor.  See Response at 6.  In her affidavit, Gonzales states:

> As a supervisor I was still required to take citizen calls, and the other supervisors and I routinely spent at least three quarters (3/4) of our time answering phones just as we had when we were contact agents.

> . . . .

> In my work as a supervisor with the City I was almost never able to exercise any judgment or discretion about any important matter; in particular, I never had any role whatsoever in hiring or firing of employees, or even in recommending their hiring or firing.

e.g., Tenenbaum Depo. at 47:16-48:14, 50:3-20; Waites Depo. at 23:8-16, 24:5-18, 25:7-11; Gonzales Depo. at 38:5-39:15.   Gonzales attended management training that discussed the supervisory responsibilities in managing a team of employees.   See, e.g., Gonzales Depo. at 32:18-21, 33:25-34:7; Amended Memorandum ¶ 15, at 4 (setting forth this fact); Response at 5-6 (not controverting  this fact).

When she was promoted to supervisor, Gonzales' work station changed, so that she sat on a raised area overlooking the 311 CCC contact agents.   See Gonzales Depo. at 36:19-37:6; Deposition of Annette Mora 13:7-25 (taken October 14, 2009), filed July 27, 2010 (Doc. 65-7); Amended Memorandum ¶ 16, at 4 (setting forth this fact); Response at 5-6 (not controverting this fact).   Gonzales monitored her employees' calls and counseled them on how to best handle the telephone calls.   See, e.g., Gonzales Depo. at 38:2-40:20; Amended Memorandum ¶ 17, at 4 (setting forth this fact); Response at 5-6 (not controverting this  fact).   Gonzales reviewed call action and development plans with her employees based on their performance and completed progressive disciplinary forms, all of which were considered when disciplining employees.   See, e.g., Gonzales Depo. at 43:9-23, 47:6-18, 50:8-16, 53:7-15, 54:6-15; Amended Memorandum ¶ 18, at 5 (setting forth this fact); Response at 5-6 (not controverting  this fact).   Although Gonzales signed requests

Affidavit of Antoinette Gonzales ¶¶ 6, 13, at 2, 3 (executed September 5, 2010), filed September 7, 2010 (Doc. 71-1).  Gonzales' assertions regarding answering telephone calls do not controvert the Defendants' asserted fact.  Her assertion that she almost never exercised judgment or discretion, and did not have a role in hiring or firing employees, or recommending hiring or firing, however, controverts the Defendants' assertion that all 311 supervisors were responsible for making recommendations for dismissals and making hiring decisions.  Because the Court must resolve all reasonable inferences in the Plaintiffs' favor, the Court will take Gonzales' assertion that she did not have a role in hiring or recommending firing as true.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).

for leave and requests for overtime, she did not have the authority to approve the requests.[9]  See,

e.g., Gonzales Aff. ¶ 14, at 3; Gonzales Depo. at 58:6-59:9, 59:19-21, 60:5-16, 62:5-19, 63:10-64:5.

311 CCC contact agents referred to Gonzales as their supervisor, and Gonzales participated in the

agents' interviews.  See, e.g., Mora Depo. at 9:15-19, 10:9-11; Deposition of Caroll Austin at 40:25-

41:4 (taken October 13, 2009), filed July 27, 2010 (Doc. 65-9); Deposition of Sarah Clover at 11:2-

12:2 (taken October 14, 2009), filed July 27, 2010 (Doc. 65-11); Amended Memorandum ¶ 20, at

5 (setting forth this fact); Response at 5-6 (not controverting this fact).

---

[9] The Defendants assert that "Gonzales participated in granting leaves of absences, sick leave and approving overtime by considering and signing off on employee request forms."  Amended Memorandum ¶ 19, at 5 (citing Gonzales Depo. at 59-59, 60-64; Mora Depo. at 11-13).  The Plaintiffs dispute this asserted fact, directing the Court's attention to Gonzales' Affidavit, which states: "Supervisors, such as myself, did not have any authority to authorize overtime work or absence from work.  All approvals were required to be in writing and could only be approved by Charles Cowen and Esther Tenenbaum."  Affidavit of Antoinette Gonzales ¶ 14, at 3 (executed September 5, 2010), filed September 7, 2010 (Doc. 71-1).  In her deposition, Mora testified that Gonzales signed one of her vacation requests, because her supervisor was not there, and two supervisors had to sign the request.  See  Mora Depo. at 11:22-12:11.  Mora also testified that Gonzales' signature was on another vacation request and that she would have submitted the request to one of the supervisors.  See Mora Depo. at 13:7-15.  In her deposition, Gonzales stated that her signature was on the bottom of a request for leave of absence form.  See Gonzales Depo. at 58:6-9. In response to a question whether the employee submitted the request to her for approval, she stated:

> The employee would at first submit this with a paper on top that would go to the --
> well, to the operations manager to approve the absence.  And so they could either
> submit it directly to them or they would give it to me, and I would turn it in to the
> operations manager.  But the only person that could approve an absence was the
> operations manager, Charles Cowen at the time, . . . .

Gonzales Depo. at 58:14-22.  Gonzales further testified that usually an employee would inform her if he or she worked overtime, and the employee would submit the overtime to her and the operations manager.  See Gonzales Depo. at 60:13-16.  She acknowledged that she signed overtime request forms and a request for sick leave.  See Gonzales Depo. at 62:5-64:5.  She testified, however, that a division manager would have to approve overtime.  See Gonzales Depo. at 59:19-21.  Taking the facts in the light most favorable to Gonzales, see Hunt v. Cromartie, 526 U.S. at 551, it appears that, although Gonzales signed absence requests and overtime requests, she did not have authority to approve the requests.

During her tenure, Gonzales was placed on intermittent FMLA leave.  See Tenenbaum Depo. at 99:4-7; Amended Memorandum ¶ 21, at 5 (setting forth this fact); Response at 5-6 (not controverting this fact).  The City of Albuquerque terminated Gonzales in September 2008, because two employees submitted complaints about her, and because she hosted a charity event at the 311 CCC in the 311 CCC's name, contravening the City of Albuquerque's policies when she was told not to do so.[10]  See Tenenbaum Depo. at 53:19-54:3, 102:21-104:14.

### b.    Austin.

Austin began working as an agent at the 311 CCC in June 2005.  See Austin Depo. at 5:5-10 (stating that she first started working for the City of Albuquerque in "June of 2005" at the 311 CCC).  In October 2007, Austin requested placement on medical leave from Esther Tenenbaum and Betty Dinelli, who worked for the administration in payroll.  See Austin Depo. at 11:3-12:14.

---

[10] The City of Albuquerque asserts it terminated Gonzales because of employee complaints, and because she hosted a charity event in contravention of the City of Albuquerque's policies and after she was told not to do so.  See Am. Mem. ¶ 22, at 5 (citing Tenenbaum Depo. at 53-54, 102-104).  The Plaintiffs dispute this fact, stating:

> As for the 'reasons' for terminating . . . Gonzales' employment, from the employee's point of view there had been a work-related injury for which she received Workers' Compensation benefits.  She had surgery on May 21, 2008, and a second surgery on July 30, 2008. . . . Gonzales returned to work on August 18, 2008, but on September 12, 2008, she was informed by . . . Tenenbaum "that the City was 'no longer in need of [her] services.'"

Response at 6-7 (citing Gonzales Aff. ¶¶ 18, 19, at 4).  In her affidavit, Gonzales states she believes she was terminated because Tenenbaum thought she could avoid Workers' Compensation liability for Gonzales' work-related injury if she fired Gonzales.  See Gonzales Aff. ¶ 20, at 4.  Because Gonzales does not have personal knowledge of the reason for her termination, and because her affidavit sets forth only her belief as to the reason of her termination, the Court finds that her statements in her affidavit do not create a genuine issue of material fact.  See Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991)(stating that, at the summary judgment stage, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient" to create genuine issues of material fact).

-17-

Tenenbaum and Dinelli informed her that she had approximately forty-seven hours of FMLA leave. See Austin Depo. at 11:24-12:5.  Tenenbaum informed Austin that she would be considered a voluntary resignation if she did not show up for work after she exhausted all the leave to which she was entitled.  See Tenenbaum Depo. at 55:10-56:14, 91:19-93:2, 97:2-6.  Subsequently, Austin exhausted her leave and then did not return to work for three days.  See Austin Depo. at 16:1-25, 20:7-23:5.  The City of Albuquerque terminated Austin's employment, informing her that her services were no longer needed.[11]  See Austin Depo. at 22:23-23:5; Tenenbaum Depo. at 55:10-56:14, 91:19-93:2, 97:5-6.

   c.   **Mora**.

      In May 2005, the City of Albuquerque hired Mora to work as an agent at the 311 CCC.  See, e.g., Mora Depo. at 7:21-8:5; Amended Memorandum ¶ 25, at 6 (setting forth this fact); Response

---

      [11] The Plaintiffs dispute these asserted facts, stating: "Austin . . .gives a different account in her Affidavit."  Response at 7.  In her affidavit, Austin stated:

         I spoke to . . . Tenenbaum . . . and advised that I would have to have my gallbladder removed and would need to take time off . . . .  At this time . . . Tenenbaum, Betty Dinelli and I sat in on a meeting to go over how much time was available.  I was advised at this time I had approximately 40hours + left of FMLA.  At this time Esther advised that I should continue to try and get more of my FMLA time back per [sic] it is used on a running calendar year.  I took her advice and continued to work but because I was in a lot of pain I continued to use my FMLA . . . .

      . . . .

         The day after my surgery I called and left a message for my supervisor . . . .  In about 20 mins I got a phone call and it was Esther Tenenbaum. . . .  [S]he said . . . I am calling to let you know . . . "your services are no longer needed."

Affidavit of Caroll Austin ¶ 5, at 2 (executed September 6, 2010), filed September 7, 2010 (Doc. 71-2).  Nothing in Austin's affidavit specifically controverts the Defendants' asserted facts.  The Court therefore deems the asserted facts admitted.  See D.N.M.LR-Civ 56.1(b).

at 7 (not controverting fact).  During her tenure, Mora requested and was granted a leave of absence, and she exhausted 960 hours during such leave.  See, e.g., Mora Depo. at 18:8-14; Amended Memorandum ¶ 26, at 6 (setting forth this fact); Response at 7 (not controverting fact).  The City of Albuquerque sent Mora a letter advising her she had exhausted this leave.  See, e.g., Mora Depo. at 22:5-23:11; Amended Memorandum ¶ 26, at 6 (setting forth this fact); Response at 7 (not controverting this fact).  Mora did not return to work after exhausting her leave, and, consequently, the City of Albuquerque treated her situation as a voluntary resignation under its policies and procedures.  See Tenenbaum Depo. at 60:17-22, 79:15-80:15; Amended Memorandum ¶ 27, at 6 (setting forth this fact); Response at 7 (not controverting fact).

> **d.   Clover.**

The City of Albuquerque employed Clover as an agent at the 311 CCC.  See, e.g., Clover Depo. at 5:25-6:24; Amended Memorandum ¶ 28, at 6 (setting forth this fact); Response at 7 (not controverting fact).  On December 19, 2006, Clover went on maternity leave; she returned to a full-time schedule in late May or June when she had exhausted her FMLA leave.  See Clover Depo. at 32:10-15; Amended Memorandum ¶ 29, at 6 (setting forth this fact); Response at 7 (not controverting fact).  Clover continuously violated the City of Albuquerque's attendance policies, was placed on a progressive discipline plan, and was ultimately terminated for her failure to adhere to such policies.[12]  See Tenenbaum Depo. at 53:1-13, 114:17-25, 118:10-12.

---

[12]  The Defendants assert that Clover continuously violated the City of Albuquerque's attendance policies, was placed on a progressive discipline plan, and was ultimately terminated for her failure to adhere to the policies.  See Am. Mem. ¶ 30, at 6 (citing Tenenbaum Depo. at 53, 114, 118-19).  The Plaintiffs dispute this asserted undisputed fact, stating: "Clover disputes this account." Response at 7.  The Plaintiffs do not direct the Court's attention to any evidence disputing this asserted fact.  In her affidavit, however, Clover asserts: "Throughout the time [she] was at the contact center [she] consistently met or exceeded all requirements and call quality standards;" that she "was a consistently excellent employee and [her] Agent Score Cards from the date of my

-19-

e. **Bordlemay.**

On or around November 19, 2009, the City of Albuquerque terminated Bordlemay's

employment as a 311 CCC contact agent, because of her mishandling of a citizen call and for her

lack of respect for, or professionalism to, clients.[13]   See Tenenbaum Depo. at 30:24-31:14.

_____

employment to March 11, 2007, showed 100% attendance;" that she received "numerous awards,
certificates, and kudos concerning [her] attendance, performance, and competence;" and that she
believes that she was a "competent and capable employee," as shown by performance and quality
records.  Affidavit of Sarah Clover ¶¶ 7, 8, 11, 17, at 3, 4 (undated), filed September 7, 2010 (Doc.
71-4).  Clover states she believes her termination was related to her use of FMLA leave time.
See Clover Aff. ¶ 14, at 4.  Because Clover does not have personal knowledge of the reason for her
termination, her affidavit sets forth her belief as to the reason of her termination, the Court finds that
her statements in her affidavit do not create a genuine issue of material fact as to the reason for her
termination.  See Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991)(stating that, at the summary
judgment stage, "the nonmovant's affidavits must be based upon personal knowledge and set forth
facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient"
to create genuine issues of material fact).  The Court also finds that Clover's statements regarding
her agent score cards showing 100% attendance and her recognition as a competent employee do
not controvert the evidence that she violated the City of Albuquerque's policies regarding
attendance, because Tenenbaum's deposition indicates that tardiness may have been a part of the
attendance policies, see Tenenbaum at 53:7-9, and a showing of 100% attendance might not reflect
violations of the attendance policies, such as tardiness.  Furthermore, the City of Albuquerque's
recognition that Clover was a competent employee does not controvert the City of Albuquerque's
assertion that she violated its policies.  Because the Plaintiffs have not controverted the Defendants'
asserted fact as undisputed.  See D.N.M.LR-Civ 56.1(b).

[13] The Plaintiffs dispute this fact, arguing that Bordlemay did not mishandle any call and that
she was terminated because she allegedly refused to show remorse to Tenenbaum regarding the
allegedly mishandled call.  See Response at 8.  The Plaintiffs do not direct the Court to any evidence
supporting this assertion.  Bordlemay's affidavit, however, states that Tenenbaum "ordered me into
her office, told me that she had approval from the City Legal Department to fire me, engaged me
in a discussion about a call, and told me that my 'services are no longer needed.'"  Affidavit of
Nicole Bordlemay ¶ 6, at 2 (signed September 6, 2010), filed September 7, 2010 (Doc. 71-8).
Bordlemay also states that, "[a]t the hearing in which the City unsuccessfully appealed the award
of unemployment benefits, . . . Tenenbaum testified that she would not have terminated my
employment if I had 'shown remorse' about the telephone call; I did not think I had mishandled the
call . . . ."  Bordlemay Aff. ¶ 7, at 2.  This testimony does not controvert that the evidence that
Bordlemay's mishandling of the call led to her termination.  Evidence that a showing of remorse
might have mitigated her alleged conduct does not controvert the evidence that she did not properly
handle the telephone call or that her handling of the telephone call led to her termination.  The Court
will therefore treat the Defendants' asserted fact as undisputed.  See D.N.M.LR-Civ 56.1(b).

  **f.**   **Foster.**

  On or about October 19, 2009, the City of Albuquerque terminated Foster's employment as a 311 CCC contact agent, because she violated the City of Albuquerque's policy and procedures by taking personal time in the "chill room" and by wearing earphones while at work.[14]  Deposition of Nicole Foster at 5:9-19, 40:16-42:12, 47:3-5 (taken January 13, 2010), filed July 27, 2010 (Doc. 65-15).

  **g.**   **Garcia.**

  In September 2009, the City of Albuquerque terminated Garcia's employment as a 311 CCC contact agent, pursuant to the City of Albuquerque's progressive disciplinary procedures, for performance-related issues.[15]  See Deposition of Yolanda Garcia at 10:11-13, 26:10-27:2 (taken

---

  [14] The Plaintiffs dispute this asserted fact, stating that, in Foster's Affidavit, Foster describes her use of the "chill" room and explains that once she read the policy regarding conduct in the room, she told Tenenbaum that it would not happen again. Response at 8 (citing Affidavit of Nicole Foster ¶ 7, at 2, filed September 7, 2010 (Doc. 71-7)).  In her affidavit, Foster also states: "I later learned during an unemployment hearing that the reason I was terminated was for my misconduct in the chill room." Foster Aff. ¶ 8, at 2.  This evidence does not controvert the evidence that she was terminated for misconduct in chill room and wearing earphones at work.  The Court will therefore deem the Defendants' asserted fact admitted.  See D.N.M.LR-Civ 56.1(b).

  [15] The Plaintiffs dispute this asserted fact, stating that, because Garcia did not know why she was terminated, her deposition testimony cannot support the City of Albuquerque's contention about the reason she was terminated.  See Response at 9 (citing Affidavit of Yolanda Garcia ¶ 14, at 4 (signed September 6, 2010), filed September 7, 2010 (Doc. 71-6).  Garcia's affidavit states that, on September 9, 2009, Tenenbaum presented her with a letter stating her services were no longer needed.  See Garcia Aff. ¶ 14, at 4.  The Plaintiffs are correct in asserting that Garcia does not have personal knowledge of why she was terminated.  In Garcia's deposition, however, she testified that she received a number of written warnings, and that the warnings she received followed the chronology set forth in the City of Albuquerque's progressive disciplinary policy.  See Garcia Depo. at 26:10-27:2.  This deposition testimony supports the asserted fact that she was terminated pursuant to the City of Albuquerque's progressive discipline policies.  Furthermore, Tenenbaum testified that Garcia was terminated for not meeting quality standards after she was on disciplinary action.  See Tenenbaum Depo. at 57:9-11.  This testimony corroborates Garcia's testimony that she received multiple written warnings related to her performance.  See Garcia Depo. at 26:10-14.  The evidence in the record thus supports the Defendants' asserted fact, and Garcia's statements in her affidavit

-21-

January 13, 2010), filed July 27, 2010 (Doc. 65-17); Tenenbaum Depo. at 57:9-11 (stating that Garcia was terminated for "not meeting quality standards after being on disciplinary action").

        h.    **Pescetti.**

On or around May 16, 2008, the City of Albuquerque terminated Pescetti's employment as a 311 CCC contact agent, because of his poor behavior during a phone call with a citizen.[16]  See Tenenbaum Depo. at 58:23-59:2, 131:15-24.

        i.    **Waites.**

Waites received a "Final Written" in December 2009 for tardiness, notifying her that she may be terminated if she had further incidents in the next 90 days.  See Waites Depo. at 43:16-44:18.  She was terminated soon after.[17]  See Waites Depo. at 58:1-14.

_____

do not controvert this asserted fact.  The Court will therefore deem this asserted fact admitted. See D.N.M.LR-Civ 56.1(b).

   [16] In support of their assertion that Pescetti was terminated because of a citizen complaint against him, the Defendants cited as support Pescetti's deposition.  The Plaintiffs respond, arguing that his deposition does not support this assertion.  In his deposition, Pescetti testified that he was not aware that Gonzales, his supervisor, reported a citizen complaint regarding a call the citizen had with Pescetti to Tenenbaum.  See Deposition of James Pescetti, Jr., at 20:6-14, 21:19-25 (taken January 14, 2010), filed July 27, 2010 (Doc. 65-19).  Similarly, in his affidavit, Pescetti stated that, at the deposition, he was asked questions about complaints and conferences that he "supposedly had with supervisors concerning those complaints about [his] calls," and that he was "not aware of any of the issues [he] was asked about."  Affidavit of James Pescetti, Jr. ¶ 9, at 2 (signed September 5, 2010), filed September 7, 2010 (Doc. 71-5).  Although the Court agrees that Pescetti's deposition does not support the Defendants' asserted fact, there is evidence in the record that supports the Defendants' asserted fact, and neither Pescetti's deposition testimony nor his affidavit controvert this evidence.  The Court will therefore deem this asserted fact admitted.  See D.N.M.LR-Civ 56.1(b).

   [17] The Defendants asserted in their Amended Memorandum: "In or around June 2005, the City terminated Waites's employment pursuant to its progressive disciplinary procedures because of several performance issues, misconduct, and repeated violates of the City's attendance policies." Amended Memorandum ¶ 35, at 7 (citing Waites Depo. at 43-47).  The Plaintiffs respond, stating that the City of Albuquerque terminated Waites in January 2010 and that Waites' testimony in her deposition does not support the Defendants' asserted fact.  In Waites' deposition, she testified that

3.     **The Plaintiffs Knew That They Were Unclassified Employees.**

Bordlemay knew she was an at-will employee.  See, e.g., Bordlemay Depo. at 7:19-22 ("Being an at-will employee, I -- I understand you can be fired for not doing your job or -- you know, standard reasons for being fired.  But the fact that I'm being fired as a -- an at-will employee . . . .");  Amended Memorandum ¶ 36, at 7 (setting forth this fact);  Response at 10-11 (not specifically controverting this fact).  Bordlemay acknowledges that she signed a document stating "Employment Status: Unclassified."  Bordlemay Depo. at 14:10-13, 15:2.  See, e.g., Bordlemay's Employment Information Form at 1; City of Albuquerque Memorandum Re: Recommendation for Hire/Promotion at 1 (dated December 9, 2005), filed July 27, 2010 (Doc. 65-14);  Amended Memorandum ¶ 36, at 7 (setting forth this fact);  Response at 10-11 (not specifically controverting this fact).

Foster knew from the beginning of her employment that she was unclassified; she received documents that stated that she was an unclassified hire and explained what unclassified meant in training on her first day of employment.  See, e.g., Foster Depo. at 14:17-16:25; City of Albuquerque Personnel Action, New Hire at 1, filed July 27, 2010 (Doc. 65-16); Foster's Employment Information Form at 1; City of Albuquerque Memorandum Re: Recommendation for Hire/Promotion at 1, filed July 27, 2010 (Doc. 65-16); Amended Memorandum ¶ 37, at 7-8 (setting

---

she received a "Final Written" on December 29, 2009 for tardiness, see Waites Depo. at 43:16-44:17, that she was concerned about losing her job after an incident with the APD on New Year's Eve, see Waites Depo. at 45:21-47:7, and that New Year's Eve was her last day of work, see Waites Depo. at 58:11-14.  It is unclear to what incident Waites refers, how the incident could have affected her position, and why Waites was terminated.  The Court agrees with the Plaintiffs that Waites' deposition does not support the asserted fact that she was terminated pursuant to the City of Albuquerque's progressive disciplinary procedures because of performance issues, misconduct, and violations of the City of Albuquerque's attendance policies.  The Court will therefore limit the asserted fact to one that the evidence in the record supports.

forth this fact); Response at 10-11 (not specifically controverting this fact).

When Garcia began her employment at the 311 CCC, she signed a document that stated her status was unclassified.  See, e.g., Garcia Depo. at 17:5-19; Garcia's Employment Information Form at 1; Amended Memorandum ¶ 38, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).  Garcia states that she understood the document she signed, but denies that she understood the meaning of unclassified; Garcia states never sought clarification or asked anyone what unclassified meant.  See, e.g., Garcia Depo. at 17:5-19; Amended Memorandum ¶ 38, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting this fact).

When Pescetti began his employment, he signed an Employment Information Form that shows his status of unclassified.  See, e.g., Pescetti's Employment Information Form at 1; Amended Memorandum ¶ 39, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).  Pescetti also gained understanding of the meaning of unclassified status during new hire training when Tenenbaum and Padilla discussed unclassified status with new hires.  See, e.g., Pescetti Depo. at 10:3-24; Amended Memorandum ¶ 39, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).

Gonzales knew she was unclassified from the beginning of her employment; during the 311 CCC's employees' new hire training Padilla explained that 311 CCC employees were unclassified.  See, e.g., Gonzales Depo. at 13:11-15:8; Amended Memorandum ¶ 40, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).  Furthermore, several times during Gonzales' employment, Tenenbaum said that 311 CCC employees were at will.  See, e.g., Gonzales Depo. at 17:1-3; Amended Memorandum ¶ 40, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).  Some of the agents whom Gonzales supervised knew that they were unclassified, as they asked whether they could become classified.  See, e.g., Gonzales Depo. at

18:25-19:6; Amended Memorandum ¶ 41, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact). In the summer of 2009, Gonzales met with Charles Cowen, another employee of the 311 CCC, to discuss employees' concerns regarding wanting to be classified. See, e.g., Gonzales Depo. at 24:3-25:10; Amended Memorandum ¶ 41, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).

Austin understood that she held an unclassified position at the 311 CCC. See, e.g., Austin Depo. at 9:12-16, 9:24-10:4; Amended Memorandum ¶ 42, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact). She received and signed documents reflecting her unclassified status. See, e.g., Austin's Employment Information Form at 1; City of Albuquerque Personnel Action, New Hire at 1; Amended Memorandum ¶ 42, at 8 (setting forth this fact); Response at 10-11 (not specifically controverting fact).

Mora first became aware that she was an unclassified employee when she attended new-hire training that Padilla presented. See, e.g., Mora Depo. at 18:24-19:9; Amended Memorandum ¶ 43, at 9 (setting forth this fact); Response at 10-11 (not specifically controverting fact). She understood that unclassified employees were not eligible for physical layoff like classified employees were. See, e.g., Mora Depo. at 26:13-22; Amended Memorandum ¶ 43, at 9 (setting forth this fact); Response at 10-11 (not specifically controverting fact). Mora also received and signed documents reflecting her unclassified status. See, e.g., Mora's Employment Information Form at 1; City of Albuquerque Personnel Action, New Hire at 1, filed July 27, 2010 (Doc. 65-8); Amended Memorandum ¶ 43, at 9 (setting forth this fact); Response at 10-11 (not specifically controverting fact).

Waites signed a document that stated her employment status as unclassified when she began to work at the 311 CCC. See, e.g., Waites Depo. at 19:10-20:10; Amended Memorandum ¶ 44, at

9 (setting forth this fact); Response at 10-11 (not specifically controverting fact). Waites understood that employees of the 311 CCC could be terminated for no reason at all. See, e.g., Waites Depo. at 59:8-18; Amended Memorandum ¶ 44, at 9 (setting forth this fact); Response at 10-11 (not specifically controverting fact).[18]

## PROCEDURAL BACKGROUND

On April 8, 2009, Gonzales, Austin, Clover, and Mora, on behalf of themselves and a class of similarly situated city employees, filed a Complaint of Violations of Statutory and Constitutional Law in the Second Judicial District Court, Bernalillo County, New Mexico. See Doc. 1-1 ("Complaint"). On May 27, 2010, the Defendants removed the case to federal court. See Notice of Removal, filed May 27, 2010 (Doc. 1). On October 8, 2009, the Court granted the Plaintiffs' unopposed motion to join Pescetti as a plaintiff. See Order, filed October 8, 2010 (Doc. 20). On

---

[18] In response to the facts contained in paragraphs 36 through 44 of the Defendants' Amended Memorandum, the Plaintiffs state:

> In their Affidavits, the Plaintiffs all agree that they were informed that their new jobs were 'unclassified' only after they had accepted the positions with the City.

. . . .

> [A]ll the Plaintiffs agree, and other testimony confirms, that the Plaintiffs were told that 'we received higher pay as unclassified employees, but that we received all other benefits and had all the rights of other City employees."

Response at 11 (citations omitted). In their affidavits, the Plaintiffs state that they did not know that the City of Albuquerque positions were unclassified when they accepted the positions. See, e.g., Gonzales Aff. ¶ 2, at 1; Austin Aff. ¶ 3, at 1; Mora Aff. ¶ 3, at 1; Clover Aff. ¶ 3, at 1; Pescetti Aff. ¶ 3, at 1; Garcia Aff. ¶ 3, at 1; Affidavit of Nicole Foster ¶ 3, at 1 (dated December 27, 2011), filed September 7, 2010 (Doc. 71-7); Bordlemay Aff. ¶ 3, at 1. This testimony does not, however, controvert the Defendants' assertion that they knew they were unclassified. Similarly, the evidence relating to what they were told regarding why they were not classified does not controvert the assertion that they knew they were not classified. The Court will therefore deem these asserted facts admitted. See D.N.M.LR-Civ 56.1(b).

February 18, 2010, the Court granted the Plaintiffs' unopposed motion to join Garcia, Foster, Bordlemay, and Waites as Plaintiffs.  See Order, filed February 18, 2010 (Doc. 40).

The Plaintiffs have brought claims alleging that the City of Albuquerque breached the Plaintiffs' employment contracts, denied them due process and equal protection, and wrongfully terminated the Plaintiffs' employment.  See Complaint ¶¶ 27-42, at 8-10.  In Count I, the Plaintiffs allege that "the City Defendants have breached their contracts of employment with the Plaintiffs, have unreasonably taken disciplinary action without just cause, have denied the Plaintiffs and others their contractually required process, and are liable for damages proximately resulting from those contract violations."  Complaint ¶ 29, at 8.  In Count II, the Plaintiffs allege that the "Defendants have violated and denied the right of due process of Plaintiffs and other similarly situated employees who have been terminated without just cause and have been denied any pre-determination or post-termination process to grieve or appeal the actions against them," and that the "Defendants have treated Plaintiffs and similarly situated employees and former-employees as second-class employees, even through there is no meaningful or reasonable distinction or difference between these employees and 'classified' City employees performing the same or similar work."  Complaint ¶¶ 33, 34, at 8, 9.  Count III alleges wrongful termination of employment, because the Plaintiffs were uninformed of their "unclassified" status, and "some or all Plaintiffs have been discriminated against and terminated for improper and illegal reasons, in violation of their statutory rights and entitlements."  Complaint ¶¶ 40-41, at 10.  The Plaintiffs also allege in Count IV that the Defendants violated some Plaintiffs' rights under the FMLA, see Complaint ¶¶ 43-44, at 10, and allege in Count V that the Defendants violated Gonzales' rights under the FLSA, see Complaint ¶¶ 45-47, at 10-11.  The Plaintiffs also seek declaratory judgment in Count VII, stating that "[i]ncluded in the issues . . . ripe for a declaratory judgment are the issues of property interests in employment, entitlement to

union representation, entitlement to hearings, [and] de facto status as classified employees." Complaint ¶ 58, at 13.  According to the Complaint, the class that the Plaintiffs seek to represent consists of "all persons who were treated (or are now being treated) as 'unclassified' employees of the City of Albuquerque without good reason or justification, and who have suffered damages and are entitled to injunctive, declaratory, or equitable relief as a result of that treatment."  Complaint ¶ 50, at 11-12.

On May 12, 2010, the Plaintiffs moved the Court for class action certification. See Plaintiffs' Motion for Class Action Certification, filed May 12, 2010 (Doc. 49).  The Court denied the Plaintiffs' motion for class certification, finding that the "terminated 311-CCC employees have a conflict of interest with current 311-CCC employees, and [that] the number of 311-CCC employees terminated is too few for a class action," but granted the Plaintiffs thirty days leave to amend the Complaint and join additional Plaintiffs.  See Memorandum Opinion and Order at 1, filed August 21, 2010 (Doc. 69).

The Defendants move, pursuant to rule 56 of the Federal Rules of Civil Procedure and D.N.M.LR 56.1, for summary judgment on all of the Plaintiffs' claims.  See Defendants' Motion for Summary Judgment, filed June 21, 2010 (Doc. 56).  The Defendants filed with their motion a memorandum of law setting forth the grounds for the motion and in support of the motion.  See Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed June 21, 2010, 2010 (Doc. 57).  Pursuant to the Court's July 13, 2010 Order, see Doc. 62, the Defendants withdrew their original Memorandum and filed their Amended Memorandum of Law in Support of Their Motion for Summary Judgment.  See Doc. 65 ("Amended Memorandum").

The Defendants contend that the Plaintiffs' claims fail in their entirety and that the Court should grant summary judgment on all of the Plaintiffs' claims.  See Amended Memorandum at 9.

The Defendants argue that the Plaintiffs' breach-of-contract claim fails, because the Plaintiffs were at all times at-will employees with no contract of employment.  See Amended Memorandum at 11. The Defendants contend that the Plaintiffs' claims for denial of due process and equal protection fail, because the Plaintiffs did not plead a violation of 42 U.S.C. § 1983, because the Plaintiffs were unclassified, at-will employees, with no reasonable expectation of continued employment, and because the Plaintiffs were not treated differently from other City employees who were similarly situated, there were legitimate reasons for the Plaintiffs' unclassified status, and the Plaintiffs cannot prove discriminatory intent.  See Amended Memorandum at 12-16.  The Defendants contend that the Plaintiffs' wrongful termination claims fail, because the Plaintiffs were at-will employees with no employment contracts.  See Amended Memorandum at 16.  The Defendants further argue that the Plaintiffs' FMLA claims fail, because the Plaintiffs were provided, and exhausted, all FMLA leave to which they were entitled.  See Amended Memorandum at 18.  The Defendants argue that Gonzales' FLSA claim fails, because Gonzales was exempt from the FLSA under the executive exemption.  See Amended Memorandum at 21.  The Defendants also argue that the Plaintiffs are not entitled to declaratory judgment.  See Amended Memorandum at 10.

The Plaintiffs responded, arguing that the Court should deny the Defendants' Motion for Summary Judgment.  See Plaintiffs' Response to Defendants' Motion for Summary Judgment at 27, filed September 7, 2010 (Doc. 71)("Response").  The Plaintiffs argue that they had an implied contract.  See Response at 14.  The Plaintiffs contend that the Court should not grant summary judgment on their claim for denial of due process, because they had a reasonable expectation of continued employment, and because their failure to claim relief under 42 U.S.C. § 1983 is "at most a technical rather than a substantive flaw, one which could easily be repaired when the case is amended."  Response at 14-15, 20-21.  The Plaintiffs state that they will voluntarily withdraw, or

agree to dismissal, of their equal protection claims, because they are unable to "prove the necessary element of 'discriminatory intent' and [because] the existence of a possible 'rational basis' for the non-classification may . . . be problematic."  Response at 20.  The Plaintiffs contend that the Court should not grant summary judgment on their wrongful termination claims, because there are disputed issues of material fact on these claims.  See Response at 21.  The Plaintiffs further argue that genuine issues of material fact preclude the Court from granting summary judgment on their FMLA claims.  See Response at 22-23.  The Plaintiffs contend that Gonzales' FLSA claim should survive summary judgment, because the Defendants have not proved that she qualifies for the executive exemption.  See Response at 24.  Finally, the Plaintiffs argue that they seek declaratory judgment regarding "whether [they] have a reasonable expectation of continued employment such that they have a property interest in their employment," and state that the Court may issue or decline to issue declaratory judgment in its discretion.  Response at 26.

At the hearing, the Defendants stated that they disagree with the Plaintiffs' apparent argument that, if the City of Albuquerque develops a progressive discipline system, the system changes the at-will employment status, and that there is nothing inappropriate in the City of Albuquerque having a progressive discipline system coving at-will employees.  See Transcript of Hearing at 7:2-7 (taken January 10, 2011)(Bergmann)("Tr.").[19]  The Court and the Plaintiffs' counsel, Paul Livingston, engaged in this exchange:

> THE COURT:  Well, let me -- let me try this one more time.  There seems to be two arguments you're making today, and the second one I thought was what this case was about, but now I hear it being about the first issue as well as the second.  I guess the issue I thought this case was about is whether these employees were called unclassified by the City but were actually in fact classified employees because of the

---

[19] The Court's citations to the transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

> progressive disciplinary system and -- well, that's what I thought the case was about.
> And so we were going to go in and look at discovery and see if in fact as often is the
> case, somebody says they have an at-will employment but they really create such an
> expectation on the part of employees that they're going to get disciplined that it's not
> really an at will system.  I thought that was the case.
>
> MR. LIVINGSTON:  Right it was and it is and I'm not sure what the other case is,
> Your Honor.
>
> THE COURT:  Well now I'm hearing you saying that the City can't create
> [un]classified positions.
>
> . . . .
>
> THE COURT:  And that -- is that your argument, that they can't create these
> unclassified positions?
>
> MR. LIVINGSTON:  No, Your Honor.  That's -- It's not that they can't create them
> if they have valid reason to and if the employees know they're working under such
> a situation.

Tr. at 23:15-24:18 (Court, Livingston).  Mr. Livingston stated he was not facially challenging the

merit system ordinance, but that he was challenging the application of an exception to the merit

system ordinance to the employees.  See Tr. at 32:20-33:5 (Court, Livingston).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to

support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891

(10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986)("Of course, a party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the [record],

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v.

Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

     To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

     When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT LAW REGARDING PROPERTY INTERESTS AND DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due-Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment."  Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which

-34-

are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)); Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "In the context of a public employee . . . the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it." Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577; Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d 1160, 1164 (10th Cir. 1992)). "A legitimate claim of entitlement may be grounded in various sources of state law, including 'state statutes, local ordinances, established rules, or mutually explicit understandings.'" Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (quoting Dickeson v. Quarberg, 844 F.2d 1435, 1437 (10th Cir. 1988); citing Carnes v. Parker, 922 F.2d 1506, 1509 (10th Cir. 1991)). "If a plaintiff can prove he has a property interest in his employment, a state cannot deprive him of that interest without due process." Dickeson v. Quarberg, 844 F.2d at 1438.

"Whether appellant has a sufficient property interest in his employment is a matter of state law." Calhoun v. Gaines, 982 F.2d 1470, 1474 (10th Cir. 1992)(citing Bishop v. Wood, 426 U.S. 341, 344 (1976); Archer v. Sanchez, 933 F.2d 1526, 1529 (10th Cir.1991)). "[A] property interest is determined by whether the terms of employment created by contract, federal statute, city charter or an employee manual create a sufficient expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process." Graham v. City of Okla. City, Okla., 859 F.2d 142, 146 (10th Cir. 1988)(citation omitted)(alternation in original). "Taken alone, the personnel policy or employee manual might create a property interest." Graham

v. City of Okla. City, Okla., 859 F.2d at 146.

## RELEVANT NEW MEXICO LAW REGARDING AT-WILL EMPLOYMENT

New Mexico law states that employment without a written contract and for an indefinite period can be terminated at will by either party with or without cause.  In New Mexico, "an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(citation omitted).  At-will employment relationships "can be terminated by either party at any time for any reason or no reason, without liability." Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779.  "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779.

1.    **Implied Employment Contract.**

New Mexico courts have recognized that, in some instances, an employer can create an implied employment contract based on representations in an employment manual or other practices.  A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.  See Newberry v. Allied Stores, Inc., 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989)(citation omitted).  The question whether an employment relationship has been modified is a question of fact.  See Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. 664, 666, 748 P.2d 507, 509 (1988).  "An implied contract is created only where an employer creates a reasonable expectation.  The reasonableness of expectations is measured by just how definite, specific, or

-36-

explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783. If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract. Hartbarger v. Frank Paxton Co., 115 N.M. at 669, 857 P.2d at 780. "Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it." Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 666, 748 P.2d at 509 (citation omitted).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." Mealand v. E.N.M. Med. Ctr., 131 N.M. 65, 69, 33 P.3d 285, 289 (2001). "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable." West v. Wash. Tru Solutions, LLC, 147 N.M. 424, 426, 224 P.3d 651, 653 (Ct. App. 2009). In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons. See Mealand v. E.N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.

## 2. **Wrongful Termination Claims.**

New Mexico has recognized a public-policy exception to the common-law employment-at-will doctrine. See Vigil v. Arzola, 102 N.M. 682, 688, 699 P.2d 613, 619 (Ct. App.1983), rev'd in part on other grounds, 101 N.M. 687, 687 P.2d 1038 (1984), modified by Boudar v. E.G. & G., Inc., 106 N.M. 279, 280-81, 742 P.2d 491, 492-93 (1987)(allowing retroactive application), and modified by Chavez v. Manville Prods. Corp., 108 N.M. 643, 649-50, 777 P.2d

371, 377-78 (1989)(lowering plaintiff's burden of proof and allowing recovery for emotional distress).  Accordingly, an at-will employee can recover in tort when his termination contravenes a clear mandate of public policy.  See Chavez v. Manville Prods. Corp., 108 N.M. at 647, 777 P.2d at 375.  Courts determine whether an employee has stated a sufficient policy to recover for the tort of wrongful discharge on a case-by-case basis.  See Sanchez v. The New Mexican, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987); Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. 293, 304, 850 P.2d 996, 1007 (1993).  "For an employee to recover under this new cause of action, he must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn."  Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 303, 850 P.2d at 1006 (quoting Chavez v. Manville Prods. Corp., 108 N.M. at 647, 777 P.2d at 375; Vigil v. Arzola, 102 N.M. at 689, 699 P.2d at 620). "The employee must also show a causal connection between his actions and the retaliatory discharge by the employer.  If the employee proves his case by a preponderance of the evidence, he is entitled to recover damages for his pecuniary loss as well as damages for emotional distress."  Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 303, 850 P.2d at 1006 (internal citations and footnote omitted).

The Supreme Court of New Mexico has stated:

The linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a "clear mandate of public policy." See Vigil, 102 N.M. at 688, 699 P.2d at 619.  A clear mandate of public policy sufficient to support a claim of retaliatory discharge may be gleaned from the enactments of the legislature and the decisions of the courts and may fall into one of several categories. . . .

"'[U]nless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause.'"  Id. (quoting Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505, 512 (1980)).  Accordingly, the courts interpreting New Mexico law have adhered to the rule that retaliatory

-38-

discharge is a narrow exception to the rule of employment at will and have refused to expand its application. See Zaccardi v. Zale Corp., 856 F.2d 1473, 1475-76 (10th Cir.1988)(discharge for refusal to take polygraph examination did not violate public policy); Ellis v. El Paso Natural Gas Co., 754 F.2d 884, 885 (10th Cir. 1985) (discharge for use of employer's grievance procedure did not violate public policy); Jeffers v. Butler, 762 F.Supp. 308, 310 (D.N.M. 1990)(holding that no public policy stated where employee, and not public at large, would benefit from employee's whistleblowing actions), aff'd without opinion, 931 F.2d 62 (10th Cir. 1991); Salazar v. Furr's, Inc., 629 F.Supp. 1403, 1409 (D.N.M. 1986)(family unity is not public policy protected by retaliatory discharge cause of action); Paca v. K-Mart Corp., 108 N.M. 479, 480-81, 775 P.2d 245, 246-47 (1989)(discharge for violation of company policy did not violate public policy); Francis v. Memorial Gen. Hosp., 104 N.M. 698, 701, 726 P.2d 852, 855 (1986)(nurse discharged for refusing to follow employer's policy regarding "floating" did not state claim for retaliatory discharge); Maxwell v. Ross Hyden Motors, Inc., 104 N.M. 470, 474, 722 P.2d 1192, 1196 (Court. App. 1986) (Unemployment Compensation Law does not establish public policy prohibiting discharge in bad faith and without notice); Zuniga v. Sears, Roebuck & Co., 100 N.M. 414, 416-17, 671 P.2d 662, 664-65 (Court. App.)(discharge based on employer's erroneous belief that employee had attempted to steal from employer did not violate public policy), cert. denied, 100 N.M. 439, 671 P.2d 1150 (1983). In fact, in only three reported cases have the courts in this state recognized a public policy sufficient to support a cause of action for retaliatory discharge: Salazar, 629 F. Supp. at 1409 (recognizing retaliatory discharge cause of action when employee discharged to prevent vesting of pension benefits); Boudar[v. E.G. & G., Inc.], 106 N.M. [279,] 283, 285, 742 P.2d [491,] 495, 497 [(1987)](recognizing retaliatory discharge cause of action when plaintiff discharged for whistleblowing); Vigil, 102 N.M. at 690, 699 P.2d at 621 (recognizing retaliatory discharge cause of action when plaintiff discharged for reporting misuse of public funds). Whether an employee has stated a sufficient public policy to recover for the tort of retaliatory discharge is determined on a case-by-case basis. Vigil, 102 N.M. at 689, 699 P.2d at 620.

Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 303-04, 850 P.2d at 1006-07 (footnote omitted).

## LAW REGARDING THE FMLA

The FMLA entitles qualifying employees to a total of twelve administrative weeks of leave during any twelve-month period under certain specified circumstances, including instances where a serious health condition makes an employee unable to perform the functions of the employee's position, where the employee has given birth or has adopted a son or daughter, or where the employee's spouse, son, daughter, or parent has a serious health condition and needs the employee

to care for him or her.  See 29 U.S.C. § 2612(a)(1); Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1180 (10th Cir. 2006)("The FMLA guarantees the substantive rights of up to twelve weeks of unpaid leave for eligible employees of covered employers for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave.").

The FMLA states that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," and that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(1), (2).  The United States Court of Appeals for the Tenth Circuit has "recognized two theories of recovery under § 2615(a): an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1170 (citation omitted).  "The distinction between these two theories is important because the elements and burdens of proof that apply to § 2615(a)(1) claims differ from those that apply to § 2615(a)(2) claims."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1170 (citation omitted).

Courts analyze FMLA retaliation claims under the analytical framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Richmond v. ONEOK, Inc., 120 F.3d 205, 208 (10th Cir. 1997)(citation omitted).  "Under that standard, the plaintiff initially must establish a prima facie case."  See Richmond v. ONEOK, Inc., 120 F.3d at 208 (citation omitted).  To establish a prima-facie case for FMLA retaliation, "a plaintiff must show that:" (i) he or she "engaged in activity protected under the act;" (ii) "subsequently suffered adverse action by the employer;" and (iii) "a causal connection existed between the employee's activity and the adverse action."  Richmond v. ONEOK, Inc., 120 F.3d at 208-09.  "The burden then shifts to the employer

to offer a legitimate non-retaliatory reason for the plaintiff's termination."  See Richmond v. ONEOK, Inc., 120 F.3d at 208 (citation omitted).  "If the employer offers such a reason, the burden then shifts back to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual."  See Richmond v. ONEOK, Inc., 120 F.3d at 208 (citations and internal quotation marks omitted).  "A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's . . . reasons for its action, which a reasonable factfinder could rationally find . . . unworthy of credence." Richmond v. ONEOK, Inc., 120 F.3d at 209 (citation and internal quotation marks omitted).  "Mere conjecture that the employer's reason is pretext, however, will not defeat a motion for summary judgment."  See Richmond v. ONEOK, Inc., 120 F.3d at 209 (citation omitted).

To prevail on an interference theory, a plaintiff must demonstrate that: (i) he or she was entitled to FMLA leave, (ii) "some adverse action by the employer interfered with his [or her] right to take FMLA leave;" and (iii) "the employer's action was related to the exercise or attempted exercise of his [or her] FMLA rights."  Jones v. Denver Pub. Schs., 427 F.3d 1315, 1319 (10th Cir. 2005)(citation omitted).  "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, and the McDonnell Douglas burden-shifting analysis does not apply to interference claims."  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1180 (internal citations omitted).

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week. See 29 U.S.C. § 207.  The FLSA exempts individuals "employed in a bona fide executive,

-41-

administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "The employer has the burden of

showing that its employees are exempt from the FLSA's overtime provisions." Aaron v. City of

Wichita, Kan., 54 F.3d 652, 657 (10th Cir. 1995)(citing Corning Glass Works v. Brennan, 417 U.S.

188, 196-97 (1974). "An employee must fit 'plainly and unmistakenly within the exemption's

terms,' and the FLSA exemptions are to be narrowly construed." Hays v. City of Pauls Valley, 74

F.3d 1002 (10th Cir. 1996)(citing Aaron v. City of Wichita, 54 F.3d at 657).

> The Code of Federal Regulations provides:
>
> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
>> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>>
>> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>>
>> (3) Who customarily and regularly directs the work of two or more other employees; and
>>
>> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

## ANALYSIS

The Court will grant summary judgment on the Plaintiffs' due-process claims, because it

finds that the Plaintiffs did not have protected property interests in continued employment. The

Court will grant summary judgment on the Plaintiffs' breach-of-contract claims, because it finds that

the Plaintiffs have not established a genuine issue of fact whether they had implied employment

contracts.  The Court will grant summary judgment on the Plaintiffs' wrongful termination claims, because the Plaintiffs have not established an issue of fact whether they were discharged in violation of a clear mandate of public policy.  The Court will grant summary judgment on the Plaintiffs' FMLA claims.  Assuming that the Plaintiffs' FMLA claims are retaliation claims, the Court will grant summary judgment on their claims, because some of the Plaintiffs cannot establish a prima-facie case for FMLA retaliation, and because, although some of the Plaintiffs can establish a prima-facie case for FMLA retaliation, the Defendant City of Albuquerque ("the City of Albuquerque") has set forth a legitimate non-retaliatory reason for the Plaintiffs' terminations, and those Plaintiffs have not established a genuine issue of fact whether that reason is pretextual.  Assuming that the Plaintiffs' FMLA claims are interference claims, the Court will grant summary judgment on those claims, because the Plaintiffs have not established a genuine issue of fact whether the City of Albuquerque interfered with their rights to take FMLA leave.  The Court will not grant summary judgment on Gonzales' FLSA claim, because Gonzales has established a genuine issue of material fact whether she falls within the executive exemption.  The Court will deny the Plaintiffs' request that it enter declaratory judgment, because it finds that the Plaintiffs did not have a protected property interest in their continued employment, and it will grant summary judgment on the Plaintiffs' declaratory judgment claims.

## I.      THE CITY OF ALBUQUERQUE CAN CONSTITUTIONALLY CREATE AT-WILL POSITIONS.

At the hearing, Mr. Livingston appeared to contest the constitutionality of the City of Albuquerque's ability to create unclassified positions, which are at-will positions.  In an opinion addressing an equal-protection claim, the Supreme Court has affirmed the common-sense notion that "government offices could not function if every employment decision became a constitutional

matter." Engquist v. Or. Dept. of Agr., 553 U.S. 591, 599 (2008).  The Supreme Court has recognized that, although Congress and the states have, "for the most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons . . . a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not a constitutional mandate." Engquist v. Or. Dept. of Agr., 553 U.S. at 606 (internal citation omitted).  The Tenth Circuit has also recognized the concept of at-will employment in the public sector. See Pignanelli v. Pueblo Sch. Dist. No. 60, 540 F.3d 1213, 1221 (10th Cir. 2008)(stating that the "board's decision to allow [the plaintiff's] contract to lapse rather than rehire her into a position for which she was unqualified does not raise constitutional concerns"); Darr v. Town of Telluride, Colo., 495 F.2d 1243 (10th Cir. 2007)("[T]he due process clause does not preclude public employers from maintaining at-will employment relationships that the employer may terminate without cause." (citation omitted)).  The Court has not found any state cases that have stated that a municipality cannot constitutionally create at-will positions and the Court does not think there is any reason to believe state employees should receive a benefit or detriment that private sector employees, subject to at-will employment, doe not share.  New Mexico state law does not appear to draw a distinction between public and private employees for purposes of at-will employment.

At the hearing, Mr. Livingston argued that the City of Albuquerque cannot constitutionally create unclassified positions without a valid reason, because it would dilute the merit system ordinance and create a situation in which the City of Albuquerque could declare anyone to be at will. See Tr. at 25:11-26:2.  A review of the case law indicates that "a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not a constitutional mandate." Engquist v. Or. Dept. of Agr., 553 U.S. at 606.  The Constitution does not mandate that a

municipality create a merit system.  A municipality may establish a merit system, with exceptions for at-will employment, as the legislature deems fit.  Any problems with the merit system ordinance are better resolved at the local political level, instead of by a federal court.  Furthermore, the undisputed facts establish that the City of Albuquerque had a valid reason for designating positions at the 311 CCC as unclassified -- it allowed the City of Albuquerque flexibility "to operate the Center like a private facility relative to wages, benefits, employee incentives, hiring, and discipline procedures in order to provide optimum service to citizens of Albuquerque."  Herrera Decl. ¶ 7, at 1-2.

Mr. Livingston also argued that he believed that the City of Albuquerque cannot constitutionally create unclassified positions unless the employees know that they are working in an unclassified position.  Mr. Livingston stated that he believes this principle requires some evidence that the employees are unclassified.  See Tr. at 27:2-3.  The Court has not found any authority which would support the argument that the Plaintiffs' knowledge of their unclassified status affects the constitutionality of the City of Albuquerque's creation of their positions as unclassified.  Furthermore, there is evidence in the record that the CAO designated the Plaintiffs as unclassified employees.  See Mora's City of Albuquerque Recommendation for Hire/Promotion Form at 1 (recommending that Mora be hired as an unclassified employee and signed by the CAO); Clover's City of Albuquerque Recommendation for Hire/Promotion Form at 1 (recommending that Clover be hired as an unclassified employee, and signed by the CAO); Bordlemay's City of Albuquerque Recommendation for Hire/Promotion Form at 1 (recommending that Bordlemay be hired as an unclassified employee and signed by the CAO); Foster's City of Albuquerque Recommendation for Hire/Promotion Form at 1 (recommending that Foster be hired as unclassified and signed by the CAO); Garcia's City of Albuquerque Recommendation for Hire/Promotion Form

at 1 (recommending that Garcia be hired as unclassified and signed by the CAO); Pescetti's City of

Albuquerque Recommendation for Hire/Promotion Form at 1 (recommending that Pescetti be hired

and signed by the CAO); Position Control Form (B-3), filed October 15, 2010 (Doc. 79-2, Ex. A);

Position Control Form (B-3), filed October 15, 2010 (Doc. 79-2, Ex. B); Position Control Form (B-

3), filed October 15, 2010 (Doc. 79-2, Ex. C).  Moreover, Garcia, Foster, Mora, Bordlemay, Pescetti,

Austin, Clover, and Waites signed documents designating them as unclassified, <u>see</u> Mora's

Employment Information Form at 1; Austin's Employment Information Form at 1; Clover's

Employment Information Form at 1; Bordlemay's Employment Information Form at 1; Foster's

Employment Information Form at 1; Garcia's Employment Information Form at 1; Pescetti's

Employment Information Form at 1, and there is evidence that Gonzales knew she was unclassified,

<u>see</u> Gonzales Depo. at 13:11-15:8.  Because Mr. Livingston's arguments do not have support in the

law or in the facts of the case, the Court finds that the City of Albuquerque constitutionally and

legally created at-will employment positions, and that the designation of the Plaintiffs as

unclassified employees was not unconstitutional or illegal.

## II.    THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' <u>DUE-PROCESS CLAIMS</u>.

The Defendants argue that the Plaintiffs' due-process claims fail, because the Plaintiffs did

not plead a violation of 42 U.S.C. § 1983 in their Complaint, and because the amendments to the

Constitution do not create an independent cause of action.  The Defendants further argue that the

Plaintiffs' due-process claims fail, because they were unclassified, at-will employees, with no

reasonable expectation of continued employment.

The Plaintiffs argue that the Defendants have not cited any authority for the proposition that

their failure to specifically claim relief under 42 U.S.C. § 1983 renders their due process claim

invalid.  They further contend that their omission is a technical rather than a substantive flaw.  The

Plaintiffs argue that they had a protected property interest, because they had a reasonable

expectation of continued employment.  The Plaintiffs contend that, based upon the

> rules relating to conduct, performance, and the imposition of discipline both
> progressive and immediate, depending on the nature and severity of the alleged
> offenses, [the] Plaintiffs had a legitimate and reasonable expectation that the City
> would apply its rules fairly and even-handedly[,] [which] meant that [the] Plaintiffs
> had a reasonable expectation of continued employment absent just cause for
> discipline.

Response at 19.

The Plaintiffs' Complaint alleges a denial of due process, asserting that they had a property

interest in their public employment, and that the Defendants violated their right to due process by

terminating them without just cause, and by denying them pre-determination or post-termination

process or appeal.  See Complaint ¶¶ 32-33, at 8.  The Court has found no case law that supports the

proposition that a plaintiff's failure to specifically claim relief under 42 U.S.C. § 1983 merits

dismissal of the plaintiffs' claims.  Instead, the Court has previously recognized that, even when a

party does not mention 42 U.S.C. § 1983 in his or her complaint, the means through which a private

individual seeks money damages for violations of his or her constitutional rights is through 42

U.S.C. § 1983, and that it will therefore assume that 42 U.S.C. § 1983 is the vehicle through which

a party asserts his or her constitutional claims.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F.

Supp. 2d 1052, 1072 (D.N.M. 2010)(Browning, J.)(stating that the plaintiffs did not "mention 42

U.S.C. § 1983 in their Complaint," but noting that the "means by which a private individual seeks

money damages for violation of his or her constitutional rights is by the mechanism of 42 U.S.C.

§ 1983.  The Court thus assumes that it is the vehicle through which the Schaefers assert their

constitutional claims.").  As the Supreme Court stated in Baker v. McCollan, 443 U.S. 137 (1979):

-47-

"It is for violations of such constitutional and statutory rights that 42 U.S.C. § 1983 authorizes redress; that section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." 443 U.S .at 145 n.3. The Plaintiffs have pled a violation of federal law, even though they have not expressly pled 42 U.S.C. § 1983 claims. The Court therefore will not grant summary judgment on the Plaintiffs' due-process claims on this ground.

"A public employee's constitutional right to due process is implicated only where the employee has a protected property interest in continued employment and was denied constitutionally adequate due process." Alexander v. Pushmataha County/Town of Antlers Hosp. Auth., 63 F. App'x 429, 431 (10th Cir. 2003). See Lovato v. City of Albuquerque, 106 N.M. 287, 289, 742 P.2d 499, 501 (10th Cir. 1987). "Property interests are created by independent non-constitutional sources, such as state law or contractual provisions." Alexander v. Pushmataha County/Town of Antlers Hosp. Auth., 63 F. App'x at 431. See Lovato v. City of Albuquerque, 106 N.M. at 290, 742 P.2d at 502. "To create a property interest, the state-law rule or understanding must give the recipient 'a legitimate claim of entitlement to the benefit].'" Darr v. Town of Telluride, Colo., 495 F.3d 1243, 1251 (10th Cir. 2007)(citation omitted)(alteration in original). "[A] property interest is determined by whether the terms of employment created by contract, federal statute, city charter or an employee manual create a sufficient expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process." Graham v. City of Okla. City, Okla., 859 F.2d at 146 (citation omitted)(alternation in original). "For example, an employee may possess a property interest in public employment if she has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent." Darr v. Town of Telluride, Colo., 495 F.3d at 1251 (citing Bd. of Regents of State

-48-

Colls. v. Roth, 408 U.S. at 576-77; Bishop v. Wood, 426 U.S. at 344; Greene v. Barrett, 174 F.3d 1136, 1140-41 (10th Cir. 1999)).

The Court finds that the Plaintiffs did not have property interests in continued employment. Non-constitutional sources, such as state law or contractual provisions, create property interests. See Alexander v. Pushmataha County/Town of Antlers Hosp. Auth., 63 F. App'x at 431. The Plaintiffs did not have an express written employment contract with the City of Albuquerque. The Plaintiffs argue, however, that the Merit System Ordinance, which provides the policies and rules governing City of Albuquerque employment, creates a property interest in continued employment. The Plaintiffs also argue that the City of Albuquerque's rules regarding the imposition of progressive discipline, conduct, and performance created a legitimate and reasonable expectation of continued employment absent just cause for discipline. New Mexico law generally provides that employment without a written contract and for an indefinite period can be terminated at will by either party with or without cause; however, "an implied contract term that restricts the employer's power to discharge" is an exception to the general rule of at-will employment. Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779. A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct. See Newberry v. Allied Stores, Inc., 108 N.M. at 426, 773 P.2d at 1233 (citation omitted). "An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783. If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract. Hartbarger v. Frank Paxton Co., 115 N.M. at 669, 857 P.2d at 780. If the Merit System Ordinance,

or the City of Albuquerque's rules and policies, created an implied-employment contract, the Plaintiffs may have possessed a sufficient expectancy of continued employment to constitute a property interest.

The Court finds that the relevant provisions of the Merit System Ordinance do not create an implied contract.  Pursuant to Article X of Albuquerque's City Charter, a merit system was established to govern the hiring, promotion, and discharge of employees, and to provide for the general regulation of employees.  See Merit System Ordinance § 3-1-1.  Under the Merit System Ordinance, all employees are divided into unclassified service and classified service.  See Merit System Ordinance § 3-1-6(A).  Any position that the Chief Administrative Officer designates as unclassified is part of the unclassified service.  See Merit System Ordinance § 3-1-6(C)(9). "Unclassified employees are employees at will . . .[;] [s]uch employees shall have no property interest in continued unclassified employment and may be dismissed for any or no reason." See Merit System Ordinance § 3-1-6(D).

The Plaintiffs were unclassified under the Merit System Ordinance.  See, e.g., Mora's Employment Information Form at 1 (stating that Mora's employment status was unclassified and containing Mora's signature); Austin's Employment Information Form at 1 (stating that Austin's employment status was unclassified and containing Austin's signature); Clover's Employment Information Form at 1 (stating that Clover's employment status was unclassified and containing Clover's signature); Bordlemay's Employment Information Form at 1 (stating that Bordlemay's employment status was unclassified and containing Bordlemay's signature); Foster's Employment Information Form at 1 (stating that Foster's employment status was unclassified and containing Foster's signature); Garcia's Employment Information Form at 1 (stating that Garcia's employment status was unclassified and containing Garcia's signature); Pescetti's Employment Information Form

-50-

at 1 (stating that Pescetti's employment status was unclassified and containing Pescetti's signature); Gonzales Depo. at 13:11-15:8 (stating that, at the new-hire training for 311 CCC employees that Gonzales attended, Padilla explained that 311 CCC employees were unclassified); Waites Depo. at 19:10-20:10 (stating that she signed a document which stated her employment status as unclassified when she began to work at 311 CCC). Because the Merit System Ordinance explicitly provides for unclassified employees, who are terminable at will, and because the Plaintiffs were hired as unclassified employees, and knew of their unclassified status, the Court finds that the Merit System Ordinance could not create an objectively reasonable expectation that the Plaintiffs would be dismissed only in accordance with the procedures applicable to classified employees. See Mealand v. E.N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289 (stating that, in deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons). The Court therefore finds that, based on the Merit System Ordinance, the Plaintiffs could not have had a sufficient expectancy of continued employment to constitute a property interest.

The Plaintiffs allege they understood that, as unclassified employees, they received higher pay but also had all the other benefits and rights of other City employees; therefore, they had a legitimate claim of entitlement. See Gonzales Aff. ¶ 3, at 1; Austin Aff. ¶ 4, at 1; Mora Aff. ¶¶ 4-5, at 2; Clover Aff. ¶ 4, at 1; Pescetti Aff. ¶ 4, at 1; Garcia Aff. ¶ 4, at 1-2; Foster Aff. ¶ 4, at 1-2; Bordlemay Aff. ¶ 4, at 1-2. To create an implied contract, the Defendants must have made a sufficiently explicit and definite oral representation. See Gormley v. Coca-Cola Enters., 135 N.M. 128, 134, 85 P.3d at 259 (Ct. App. 2003), opinion superseded by Gormley v. Coca-Cola Enters., 137 N.M. 192, 109 P.3d 280 (2005). In their affidavits, the Plaintiffs allege that they were informed that

they had all the rights that other City of Albuquerque employees had.  See, e.g., Gonzales Aff. ¶ 4, at 2 ("[A]t a City leadership conference I spoke with City labor negotiator Paul Broome about our status, and he assured me that we had all the rights any other City employee had."); Pescetti Aff. ¶ 4, at 1 ("Michael Padilla said that the only difference between us and other City employees was that we would get more pay but that we would not be allowed to join the union."); Foster Aff. ¶ 5, at 2 ("Charles and the supervisors frequently told us that we were the same as other City employees, only we were paid more and weren't allowed to join the union.").  These alleged statements are general statements about amorphous rights, not specific statements about how the Plaintiffs would not be terminated without just cause, or how the Plaintiffs would only be terminated in accordance with the policies set forth regarding the other City employees.  Cf. Gormley v. Coca-Cola Enterprises, 135 N.M. at 135, 85 P.3d at 259 (finding that an oral representation was sufficiently explicit and definite to create a factual issue whether an implied contract exists when the regional manager discussed with the plaintiff the plaintiff remaining on the job at fifty-five hours a week until his retirement and told the plaintiff that the employer would not cut his pay "as long as he performed his job duties" and that the employer would "leave him in that position until he was ready to retire"); West v. Wash. Tru Solutions, LLC, 147 N.M. at 427-30, 224 P.2d at 654-67 (finding that the representations were sufficiently specific to create a genuine issue of fact whether there was an implied employment contract when the employer promulgated mandatory language such as "must" regarding progressive discipline policies, and outlined the steps of the progressive discipline plan).  The Court therefore finds that these representations were not sufficiently explicit to create a reasonable expectation that the Plaintiffs would be terminated only for just cause.  See Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 615-16, 41 P.3d 333, 341-42 (2001)("To create contractual rights, however, the terms of the representation must be sufficiently explicit to create

-52-

a reasonable expectation of an implied contract." (citation omitted)); <u>Gormley v. Coca-Cola Enterprises</u>, 135 N.M. at 135, 85 P.3d at 259 ("To support the existence of an implied contract, an oral representation must be sufficiently explicit and definite."). Although the Plaintiffs' affidavits therefore may create an issue of fact regarding whether their employer made representations that they had the same rights as other City of Albuquerque employees, these representation is not sufficiently specific under New Mexico law to create an implied employment contract. The Court therefore finds that the Plaintiffs did not have a sufficient expectation of continued employment, based upon these general statements and their understanding that they had all the rights and benefits of other City employees, to constitute a property interest.

The Plaintiffs also assert that the City of Albuquerque's rules regarding the imposition of progressive discipline, conduct, and performance created a legitimate and reasonable expectation of continued employment absent just cause for discipline. Although it is undisputed that the City of Albuquerque had a progressive discipline policy, <u>see</u> Gonzales Depo. at 46:16-47:11, the Plaintiffs did not direct the Court's attention to evidence in the record of the policies. The Plaintiffs have the burden of coming forward with such evidence after the Defendants have put forth evidence that the employment is at will. <u>See</u> <u>Otteson v. United States</u>, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). <u>Cf.</u> <u>McGinnis v. Honeywell, Inc.</u>, 110 N.M. 1, 791 P.2d 452, (1990)("[I]n order to prevail on contract claim, employee must show <u>express or implied</u> agreement modifying employment-at-will relationship.")(emphasis in original). The Plaintiffs contend that, because of all the rules governing conduct, performance, and progressive discipline, they had a reasonable expectation that the City

of Albuquerque would apply its rules fairly, and thus, they had a reasonable expectation of continued employment absent just cause.  The Plaintiffs appear to make the general argument that, because the City of Albuquerque had progressive discipline policies and policies regarding performance and conduct, the Plaintiffs had an implied employment contract with the City of Albuquerque.  The Court does not believe that this broad interpretation has a sound basis in the law or in the facts of this case.  New Mexico courts determine whether progressive discipline, performance, and conduct policies create an implied contract by analyzing whether the words supported a reasonable expectation on the part of the employees that they would be dismissed only in accordance with specific procedures or for specific reasons.  See West v. Wash. Tru Solutions, LLC, 147 N.M. at 426, 224 P.3d at 653.

      The majority of employers have progressive discipline policies.  It is rare that an employer terminates an employee without any warning.  If the mere existence of an employer's progressive discipline policy is enough to create an issue of fact, which requires that a jury decide the issue, almost every case involving a progressive discipline policy would go to the jury, and that would be most cases.  Such a rule would effectively gut at-will employment in New Mexico.  The Court believes that, for a plaintiff to survive summary judgment, the plaintiff must come forward with more than evidence that the employer had a progressive discipline policy; instead, the plaintiff must present some evidence of representations set forth in the policy so that the Court can determine whether the policy contains sufficient representations to create an implied employment contract, because New Mexico law states that an "implied contract is created only where an employer creates a reasonable expectation," and that the "reasonableness of expectations is measured by just how definite, specific, or explicit" the representations are.  Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783.

Although the Plaintiffs do not direct the Court's attention to evidence in the record of the City of Albuquerque's progressive discipline policies, and although it is not the Court's responsibility to scour the record for evidence to defeat the Defendants' Motion for Summary Judgment, see Hauff v. Petterson, No. 1:09-cv00639, 2010 WL 2978060, at *9 (D.N.M. July 22, 2010)(Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.'" (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)), the Plaintiffs filed the 311 CCC's procedure for progressive disciplinary action/termination as an exhibit to the Plaintiff's [sic] Memorandum in Support of Motion for Class Action Certification, filed May 13, 2010 (Doc. 50). The 311 CCC procedure regarding progressive disciplinary action/termination states:

> The purpose of the progressive disciplinary process is to help supervisors and employees resolve work-related behavior problems in an equitable and consistent manner. When immediate termination is not management's choice, a progressive disciplinary action plan may be developed to ensure employees have a reasonable opportunity to correct behavioral problems.
>
> . . . .
>
> If performance problems arise, an employee may be immediately terminated or management may choose to implement [a] progressive disciplinary action plan to correct the behavioral problem.
>
> . . . .
>
> All employees of the 311 [CCC] are unclassified City of Albuquerque employees and are employees at will, and serve at the discretion of the [CAO]. Such employees shall have no property interest in continued unclassified employment and may be dismissed for any or no reason.
>
> **Process:**
>
> **Step 1: Development Plan**
> •     Identify the problem
> •     Management shall choose to immediately terminate an employee or begin a progressive disciplinary action process.

**Step 2: WRITTEN WARNING:**
- Define the problem.
- Explain what the employee must do to correct the problem, . . . .
- Explain when the employee must have the problem corrected.
- Explain that the consequences of the Written Warning may lead to termination.
- Management may choose to immediately terminate an employee at any time during the progressive disciplinary action process.

**Step 3: WRITTEN:**
- The Written should include the same points as the Written Warning, and any other policy/procedure infraction.
- Management may choose to immediately terminate an employee rather than continue the progressive disciplinary action process with a Written.

**Step 3: FINAL WARNING:**
- The Final Warning should include the same points as the Written Warning, and any other policy/procedure infraction.
- Management may choose to immediately terminate an employee rather than continue the progressive disciplinary action process with a final warning.

**Step 4: RELEASE FROM EMPLOYMENT:**
- Management may choose to immediately terminate an employee at any time in the progressive disciplinary action process.

311 CCC Procedure Progressive Disciplinary Action/Termination of Employment at 1, filed May 13, 2010 (Doc. 50-1). The 311 CCC also has a separate policy regarding immediate termination. This policy states: "Employees may be reprimanded, suspended, demoted or terminated for any justifiable cause including, but not limited to:" (i) insubordination or uncooperative behavior; (ii) misconduct; (iii) being absent from duty without proper authorization, regardless of the length of time of the absence; (iv) other disciplinary reasons; (v) intentionally or inappropriately disconnecting a call; (vi) intentionally "bad mouth[ing]" the COA or elected officials; (vii) using rude language or rude behavior to any Citizen; (viii) incompetence, inefficiency, or inadequate performance of an employee's duties; (ix) telephone call avoidance; (x) deliberate falsification or omission of information in employment application or resume; (xi) misappropriation or personal use

of city funds, property, or property; (xii) violation of confidentiality; or (xiii) violation of substance abuse policy.  311 CCC Procedure: Immediate Termination, filed May 13, 2010 (Doc. 50-1).

The 311 CCC's progressive disciplinary action/termination policy contains numerous disclaimers, stating that employees are at-will, and may be dismissed for any or no reason; however, disclaimers do not end the Court's analysis.  See West v. Wash. Tru Solutions, LLC, 147 N.M. at 429, 224 P.3d at 656 ("While we recognize that the [handbook contained disclaimers], such disclaimers are not dispositive.").  In West v. Washington Tru Solutions, LLC, the Court of Appeals of New Mexico found that, despite the disclaimers in the handbook, the handbook "contain[ed] specific policies regarding termination for just cause and the use of progressive discipline that an employee might reasonably conclude modify the at-will relationship despite these disclaimers." 147 N.M. at 429, 224 P.2d at 656.[20]  The handbook at issue in West v. Washington Tru Solutions, LLC stated: "While employment . . . is *at will*, [Employer] applies processes within progressive discipline to provide for application of a test for just cause. . . . *Although promising to use a just cause test might undermine the at-will nature of employment, some employers choose to apply the test . . . to*

_____

[20] The Tenth Circuit has explained:

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law . . . . The federal court must follow the most recent decisions of the state's highest court . . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do . . . . In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, . . . appellate decisions in other states with similar legal principles, . . . district court decisions interpreting the law of the state in question, ... and the general weight and trend of authority in the relevant area of law . . . . Ultimately, however, the Court's task is to predict what the state supreme court would do.

Wade v. Emcasco Ins. Co., 483 F.3d 657, 665-66 (10th Cir.2007)(citations and internal quotation marks omitted).

*create a sense of fairness*."  147 N.M. at 429, 224 P.2d at 656 (emphasis in original).  The handbook

stated that, although some situations involving "extreme rule violations" might warrant immediate

termination, most rule violations "are handled in accordance with the Process Guidelines," and that

managers were "expected to" or "must" implement the progressive discipline process.  147 N.M.

at 427, 224 P.2d at 654.  Unlike the handbook at issue in West v. Washington Tru Solutions, LLC,

which stated that managers were expected to or must use the progressive discipline processes, the

311 CCC progressive discipline/termination policy does not state that supervisors are expected to,

must, or should use progressive discipline -- instead, it states that supervisors may choose to either

immediately terminate an employee or use progressive discipline.  Unlike the language in West v.

Washington Tru Solutions, LLC, which stated that the employer applied its progressive discipline

processes to provide for application of a just-cause test, and recognized that promising to use a just-

cause test might undermine the nature of at-will employment, the 311 CCC immediate termination

policy states only that the 311 CCC may terminate or discipline employees for any justifiable cause.

The Court does not believe that the one word -- justifiable -- is sufficient to override the carefully

written progressive discipline/termination policy and create a reasonable expectation that an

employee would be terminated only in accordance with progressive discipline processes.  When the

Court carefully considers the twenty-one categories that "justifiable" expressly includes, it is

difficult to imagine what legal reason would not be justifiable.  The Court believes that a reasonable

person, considering the meaning of the word "justifiable," would believe that the 311 CCC was

representing that it would not terminate or discipline employees for illegitimate reasons, such as for

a person's race, sex, nationality, handicap, or religion.  Moreover, the word justifiable is contained

in the 311 CCC's immediate termination policy and not in the progressive discipline/termination

policy; the Court therefore believes that a reasonable employee would not read the immediate

termination policy and expect that they would be terminated only in accordance with the specified

procedures in the progressive discipline/termination policy, which repeatedly state that the employee

may be terminated at any time and at in stage of the progressive disciplinary process, if management

decides to use the progressive disciplinary process at all.  See 311 CCC Progressive Disciplinary

Action/Termination of Employment at 1 ("When immediate termination is not management's

choice, a progressive disciplinary action plan may be developed . . . ."); id. at 1 (If performance

problems arise, an employee may be immediately terminated or management may choose to

implement progressive disciplinary action plan to correct the behavioral problem."); id. at 1 ("All

employees of the 311 [CCC] are . . . at will . . . [;] [s]uch employees shall have no property interest

in continued unclassified employment and may be dismissed for any or no reason."); id. at 1

("Management shall choose to immediately terminate an employee or being a progressive

disciplinary action process."); id. at 1 ("Management may choose to immediately terminate an

employee at any time during the progressive disciplinary action process."); id. at 1 ("Management

may choose to immediately terminate an employee rather than continue the progressive disciplinary

action process with a Written."); id. at 1 ("Management may choose to immediately terminate the

rather than continue the progressive disciplinary action process with a final warning.").

Although the 311 CCC's immediate termination policy lists examples of offenses

constituting justifiable cause for which an employee may be terminated, the Court does not believe

that this list creates a reasonable expectation that the 311 CCC modified the at-will employment

relationship.  In Mealand v. Eastern New Mexico Medical Center, the Court of Appeals of New

Mexico found that there was a genuine issue of fact whether an employer's handbook created an

implied contract.  See 131 N.M. at 70-71, 33 P.3d at 290-91.  The Court of Appeals came to this

conclusion because the handbook set out, with "considerable detail," a multi-stage system of

progressive discipline and prefaced the progressive discipline procedures with statements that managers were "*responsible for* the administration and *adherence to* the policies" in the handbook, because it was the employer's policy to use progressive discipline for all employees, because the progressive discipline policy provided an "extensive list of examples of conduct that may result in disciplinary action or discharge" -- each of which were arguably related to a legitimate business interest, from which an employee might infer that the employer would not discharge or discipline an employee for a reason unrelated to a legitimate business need, and -- most importantly -- because the handbook stated that no employee would be terminated without prior review from human resources.  131 N.M. at 209-91, 33 P.3d at 70-71.  Unlike the handbook at issue in <u>Mealand v. Eastern New Mexico Medical Center</u>, the 311 CCC's policies do not contain statements that management was responsible for adherence to the policies or that no employee would be terminated without prior review.  Instead, the 311 CCC's policies allow for immediate termination at any time, even during the progressive discipline process.  Furthermore, although the 311 CCC's policy regarding immediate termination sets forth specific examples of conduct that may result in immediate termination, the examples include such a broad spectrum of behavior, the Court does not believe that a reasonable employee would believe that the 311 CCC was limiting the reasons for which it could terminate the employee, given the clear disclaimers that employees were at will and could be terminated for any reason in the progressive discipline/termination policy.  The Court therefore finds that the 311 CCC's policies do not contain language that creates a reasonable expectation that the 311 CCC modified the at-will employment relationship, in light of the repeated statements that: (i) employees are at will, have no property interest in continued employment, may be dismissed for any reason; (ii) that management may choose to immediately terminate an employee or begin progressive discipline; and (iii) that management may immediately terminate an

employee at any point in the progressive discipline process.

The handbooks in both West v. Washington Tru Solutions, LLC and Mealand v. Eastern New Mexico Medical Center contained language that the management must or was expected to implement the progressive discipline processes, or was responsible for adherence to the policies. Neither 311 CCC policy contains this language or anything similar to this language.  In contrast, the 311 CCC progressive discipline/termination policy repeatedly states that management shall choose either to immediately terminate an employee or begin a progressive discipline process, and that, at any time in the progressive discipline process, management may choose to immediately terminate the employee.  Moreover, both West v. Washington Tru Solutions, LLC and Mealand v. Eastern New Mexico Medical Center are opinions from the Court of Appeals of New Mexico.  Although these opinions provide guidance regarding what the Supreme Court of New Mexico might do, they are not controlling.  The Court has not found an opinion from the Supreme Court of New Mexico which, in the implied-contract context, goes as far in finding a genuine issue of material fact whether an implied contract existed as these opinions go.  And if the Court found that the 311 CCC's policies -- and particularly the one word "justifiable" in the immediate termination policy -- create an implied contract, it would be going further than any case from the Supreme Court of New Mexico or the Court of Appeals of New Mexico has gone.  The Court will not expand New Mexico law in a manner that the state courts have not, especially when such an expansion would, in effect, severely limit at-will employment.

There is no genuine issue of fact whether the practices at the 311 CCC created an implied employment contract.  Although there is evidence in the record that Gonzales completed progressive disciplinary forms, see Gonzales Depo. at 47:6-20, 54:6-15, Gonzales did not testify that she was required to follow progressive discipline, or that she always used the progressive discipline

processes.  In <u>Kiedrowski v. Citizens Bank</u>, 119 N.M. 572, 893 P.2d 468 (Ct. App. 1995), the Court

of Appeals of New Mexico discussed whether an implied contract existed.  <u>See</u> 119 N.M. at 575,

893 P.2d at 471.  The Court of Appeals stated that, despite disclaimers in the defendant's handbook,

the handbook contained detailed disciplinary procedures which "managers must follow when

disciplining employees," and that there was evidence that the defendant "instructed their managers

to  follow the disciplinary procedures outlined in the handbook."  119 N.M. at 576, 893 P.2d at 472.

The Court of Appeals found that there was a genuine issue of material fact whether the handbook,

combined with the defendant's "actual practices," created an expectation of an implied contract

limiting the employer's right to terminate at will.  119 N.M. at 576, 893 P.2d at 472.  In <u>Clayton v.

Vanguard Car Rental U.S.A., Inc.</u>, No. CIV 09-0188, 2010 WL 5476787 (D.N.M. Dec. 9,

2010)(Browning, J.), the Court found that there was a genuine issue of fact whether the plaintiff had

a reasonable expectation that the defendant would use progressive discipline.  <u>See</u> 2010 WL

5476787, at *45.  The Court found that there was a genuine issue of fact, in part, because of

testimony in the record that the employer's supervisors were "required to follow progressive

discipline" except in cases of serious offenses, and that the supervisors believed that the only

instances in which they could bypass progressive discipline processes was in situations of serious

offenses.  2010 WL 5476787, at *45-46.  Unlike <u>Kiedrowski v. Citizens Bank</u>, where the handbook

indicated managers must follow progressive discipline processes and there was evidence that the

employer's practice was to instruct managers to follow the progressive disciplinary processes, and

unlike <u>Clayton v. Vanguard Car Rental U.S.A., Inc.</u>, where the handbook stated that the employer

may bypass its progressive discipline processes in situations involving serious offenses, creating an

issue of fact whether they would follow progressive discipline in other situations, and there was

evidence in the record that employer's practice was that managers were required to follow

progressive discipline processes, except in cases of serious offenses, in this case, there is no language in the policies that create an expectation that the at-will employment relationship was modified, and there is no evidence that the 311 CCC instructed supervisors that they had to follow or implement progressive discipline. Although Gonzales completed progressive disciplinary forms, the progressive discipline/termination policy repeatedly states that she could have immediately terminated an employee instead of using progressive discipline or that she could have terminated the employee during the disciplinary processes. Under the 311 CCC policy, it was Gonzales' choice whether to implement progressive discipline or whether to immediately terminate an employee, and the parties have not directed the Court's attention to, and the Court has not found, evidence that the 311 CCC told management that they must follow progressive discipline processes; the clear language in the progressive discipline/termination policy giving the manager complete discretion. Nor is there evidence that the 311 CCC management believed that they had to follow progressive discipline processes. That Gonzales chose to implement progressive discipline in certain instances does not create an issue of fact whether the 311 CCC's practices created a reasonable expectation that an employee would not be terminated absent progressive discipline. If the Court found that an implied contract existed, without language in the handbook which creates an expectation that the employer would follow the progressive discipline processes, and with only one word in two policies that deserves discussion, and with only evidence that Gonzales completed several progressive disciplinary forms, the Court would be going further than any case from the Supreme Court of New Mexico or from the Court of Appeals of New Mexico has gone. The Court therefore finds that there is no genuine issue of fact that the practices at the 311 CCC created an implied employment contract. See Clayton v. Vanguard Car Rental U.S.A., Inc., 2010 WL 5476787, at *44-45; Kiedrowski v. Citizens Bank, 119 N.M. at 575, 893 P.2d at 471.

Because of the disclaimers, and the language giving management complete discretion whether to immediately terminate an employee or to impose progressive discipline, the Court finds that there is no genuine issue of fact whether the policies created a reasonable expectation that the 311 CCC would terminate employees only in accordance with progressive discipline processes. Because there is no genuine issue of fact whether the Plaintiffs would be dismissed only in accordance with specified procedures, the Court finds that the Plaintiffs did not have a sufficient expectancy of continued employment, based upon the City of Albuquerque's progressive discipline/termination and immediate termination policies, to constitute a property interest.

The Court finds that the Plaintiffs did not have a property interest in continued employment, because they did not have an express contract, and because they have not created a genuine issue of fact whether they had an implied contract, and therefore possibly a sufficient expectancy of continued employment. Because the Plaintiffs did not have a property interest in continued employment, their constitutional right to due process is not implicated, and the Court will grant summary judgment on their due-process claims. See, e.g., Alexander v. Pushmataha County/Town of Antlers Hosp. Auth., 63 F. App'x at 432 ("Without a property interest in continued employment, the constitutional safeguards of procedural due process do not apply.").

III.  **THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' BREACH-OF-CONTRACT CLAIMS.**

The Defendants argue that the Plaintiffs do not allege they had a written employment contract with the City of Albuquerque, and without a written employment contract, the Plaintiffs cannot maintain this claim against the Defendants. The Defendants also allege that, the Plaintiffs cannot successfully argue that the Merit System Ordinance created an implied contract, because the only relevant portion of the Merit System Ordinance is that the CAO can designate employees as

-64-

unclassified.

The Plaintiffs argue that New Mexico courts recognize an exception to the at-will employment rule for implied employment contracts. The Plaintiffs argue that the City of Albuquerque established progressive discipline procedures, and therefore they had implied employment contracts.

"New Mexico follows the general rule that employment is terminable at will by either the employee or the employer, absent an express contract to the contrary." Zarr v. Wash. Tru Solutions, LLC, 146 N.M. 274, 278, 208 P.3d 919, 923 (Ct. App. 2009)(citation omitted). The Plaintiffs were hired as unclassified employees. An implied contract limiting an employer's ability to discharge is an exception to the general rule of at-will employment. See Zarr v. Wash. Tru Solutions, LLC, 146 N.M. at 278, 208 P.3d at 923. New Mexico courts have recognized that, in some instances, an employer can create an implied employment contract based on representations in an employment manual or other sources. A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct. See Newberry v. Allied Stores, Inc., 108 N.M. at 426, 773 P.2d at 1233 (citation omitted). The question whether an employment relationship has been modified is a question of fact. See Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. 664, 666, 748 P.2d 507, 509 (1988). "An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783. If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract. See Hartbarger v. Frank Paxton Co., 115 N.M. at 669, 857 P.2d at 780.

Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.  We do not mean to imply that all personnel manual[s] will become part of employment contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusory.

Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 666-67, 748 P.2d at 509-10 (citation omitted).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." Mealand v. E.N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.  "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable." West v. Wash. Tru Solutions, LLC, 147 N.M. at 426, 224 P.3d at 653.  In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.  See Mealand v. E.N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.

Although it is undisputed that the City of Albuquerque had a progressive discipline policy, see Gonzales Depo. at 46:16-47:11, the Plaintiffs have not directed the Court's attention to evidence in the summary judgment record regarding what language the City of Albuquerque's progressive discipline policies contained.  The Plaintiffs contend that the City of Albuquerque established

-66-

"elaborate progressive discipline procedures."  Response at 14.  Because the Plaintiffs have not directed the Court's attention to evidence in the record of these procedures, it appears that the Plaintiffs are arguing that, because the City of Albuquerque had progressive discipline policies, the Plaintiffs had an implied employment contract with the City of Albuquerque.  The Court does not believe that this broad interpretation has a sound basis in the law or in the facts of this case.  Courts determine whether progressive discipline policies create an implied contract by analyzing whether the words supported a reasonable expectation on the part of the employees that they would be dismissed only in accordance with specific procedures or for specific reasons.  See West v. Wash. Tru Solutions, LLC, 147 N.M. at 426, 224 P.3d at 653; Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. at 616, 41 P.3d at 342 (declining to find that the discipline provisions in an employment manual created an implied contract when the manual "unambiguously stated that [the employee] did not have to follow a progressive disciplinary practice before discharging an employee," and therefore the policy could not give rise to a reasonable expectation of an implied contract).  Many employers promulgate progressive discipline policies, setting forth uniform practices for the benefit of their employees.  The case law's requirement that a court peruse the language of the policies to determine whether the representations are sufficiently explicit ensures  that courts will not hold an employer liable solely because it promulgated a progressive discipline policy.

Although the Plaintiffs did not direct the Court's attention to evidence in the record of the City of Albuquerque's progressive discipline policies, and although it is not the Court's responsibility to scour the record for evidence to defeat the Defendants' Motion for Summary Judgment, see Hauff v. Petterson, 2010 WL 2978060, at *9, the Plaintiffs filed the 311 CCC's procedure for progressive disciplinary action/termination as an exhibit to the Plaintiff's [sic] Memorandum in Support of Motion for Class Action Certification.  The 311 CCC procedure

regarding progressive disciplinary action/termination states that all 311 CCC employees are at-will and that, in the face of any problems, a manager may immediately terminate an employee, or may choose to implement a progressive disciplinary plan.  See 311 CCC Procedure Progressive Disciplinary Action/Termination of Employment at 1.  The policy also gives the steps of the progressive discipline plan, should the manager choose to implement the plan instead of immediate termination.

**Process:**

**Step 1: Development Plan**
- Identify the problem
- Management shall choose to immediately terminate an employee or begin a progressive disciplinary action process.

**Step 2: WRITTEN WARNING:**
- Define the problem.
- Explain what the employee must do to correct the problem, . . . .
- Explain when the employee must have the problem corrected.
- Explain that the consequences of the Written Warning may lead to termination.
- Management may choose to immediately terminate an employee at any time during the progressive disciplinary action process.

**Step 3: WRITTEN:**
- The Written should include the same points as the Written Warning, and any other policy/procedure infraction.
- Management may choose to immediately terminate an employee rather than continue the progressive disciplinary action process with a Written.

**Step 3: FINAL WARNING:**
- The Final Warning should include the same points as the Written Warning, and any other policy/procedure infraction.
- Management may choose to immediately terminate an employee rather than continue the progressive disciplinary action process with a final warning.

**Step 4: RELEASE FROM EMPLOYMENT:**
- Management may choose to immediately terminate an employee at any time in the progressive disciplinary action process.

311 CCC Procedure Progressive Disciplinary Action/Termination of Employment at 1.  The 311

CCC also has a policy regarding immediate termination.  This policy states: "Employees may be reprimanded, suspended, demoted or terminated for any justifiable cause including, but not limited to:" (i) insubordination or uncooperative behavior; (ii) misconduct; (iii) being absent from duty without proper authorization, regardless of the length of time of the absence; (iv) other disciplinary reasons; (v) intentionally or inappropriately disconnecting a call; (vi) intentionally "bad mouth[ing]" the COA or elected officials; (vii) using rude language or rude behavior to any Citizen; (viii) incompetence, inefficiency, or inadequate performance of an employee's duties; (ix) telephone call avoidance; (x) deliberate falsification or omission of information in employment application or resume; (xi) misappropriation or personal use of city funds, property, or property; (xii) violation of confidentiality; or (xiii) violation of substance abuse policy.  311 CCC Procedure: Immediate Termination.

The 311 CCC progressive discipline/termination policy contains several disclaimers, stating that all employees are at will and may be dismissed for any or no reason, but disclaimers do not end the Court's analysis.  See West v. Wash. Tru Solutions, LLC, 147 N.M. at 429, 224 P.3d at 656 ("While we recognize that the [handbook contained disclaimers], such disclaimers are not dispositive.").  In West v. Washington Tru Solutions, LLC, the Court of Appeals of New Mexico found that, despite the disclaimers in the handbook, the handbook "contain[ed] specific policies regarding termination for just cause and the use of progressive discipline that an employee might reasonably conclude modify the at-will relationship despite these disclaimers."  147 N.M. at 429, 224 P.2d at 656.  The handbook at issue in West v. Washington Tru Solutions, LLC stated that the employer applied progressive discipline to provide for application of a just-cause test, and recognized that "promising" to use a just-cause test might undermine the at-will nature of the employment.  147 N.M. at 429, 224 P.2d at 656 (emphasis in original).  The handbook stated that

managers were "expected to" or "must" implement the progressive discipline process.  147 N.M. at 427, 224 P.2d at 654.  Unlike the handbook at issue in <u>West v. Washington Tru Solutions, LLC</u>, which stated that managers were expected to or must use the progressive discipline processes, the progressive discipline/termination policy does not state that supervisors are expected to, must, or should use progressive discipline; instead, the progressive discipline/termination policy states that supervisors may choose to either immediately terminate an employee or use progressive discipline.  Unlike the language in <u>West v. Washington Tru Solutions, LLC</u>, which stated that the employer applied its progressive discipline processes to provide for application of a just-cause test, and recognized that promising to use a just-cause test might undermine the nature of at-will employment, the language in the 311 CCC's immediate termination policy states only that the 311 CCC may terminate or discipline employees for any justifiable cause.  The Court does not believe that the word justifiable is sufficient to override the carefully written progressive discipline/termination policy and create a reasonable expectation that an employee would be terminated only in accordance with progressive discipline policies.  The Court believes that a reasonable person, considering the meaning of the word "justifiable" in the immediate termination policy would believe that the 311 CCC was representing that it would not terminate or discipline employees for illegitimate reasons, such as for a person's race, nationality, sex, handicap, or religion.  A reasonable person would not believe that this one word rewrites everything else in the progressive discipline/termination policy and the rest of the immediate termination policy, and undermines the 311 CCC's ability to terminate employees for any lawful reason.

Although the 311 CCC's immediate termination policy lists examples of offenses constituting justifiable cause for which an employee may be terminated, the Court does not believe that this list creates a reasonable expectation that the 311 CCC modified the at-will employment

relationship.  In Mealand v. Eastern New Mexico Medical Center, the Court of Appeals of New Mexico found there was a genuine issue of fact whether there was an implied contract, because: (i) the handbook at issue set out, with "considerable detail," a multi-stage system of progressive discipline and prefaced the progressive discipline procedures with statements that managers were "*responsible for* the administration and *adherence to* the policies" in the handbook; (ii) because it was the employer's policy to use progressive discipline for all employees; (iii) because the progressive discipline policy provided an "extensive list of examples of conduct that may result in disciplinary action or discharge" -- each of which were arguably related to a legitimate business interest, from which an employee might infer that the employer would not discharge or discipline an employee for a reason unrelated to a legitimate business need; and -- most importantly -- (iv) because the handbook stated that no employee would be terminated without prior review from human resources.  131 N.M. at 209-91, 33 P.3d at 70-71.  Unlike the handbook at issue in Mealand v. Eastern New Mexico Medical Center, the 311 CCC's policies do not contain statements that management was responsible for adherence to the policies or that no employee would be terminated without prior review.  Instead, the 311 CCC's policies allow for immediate termination at any time, even during the progressive discipline process.  Furthermore, although the 311 CCC's policy regarding immediate termination sets forth specific examples of conduct that may result in immediate termination, the examples include such a broad spectrum of behavior that the Court does not believe that a reasonable employee would believe that the 311 CCC through its immediate termination policy was limiting the reasons for which it could terminate the employee, given the clear disclaimers that employees were at will and could be terminated for any reason in the progressive discipline/termination policy.  The Court therefore finds that the 311 CCC's policies do not contain language that creates a reasonable expectation that the 311 CCC modified the at-will

employment relationship -- given the statements that employees are at will, have no property interest in continued employment, may be dismissed for any reason, that management may choose to immediately terminate an employee or begin progressive discipline, and that management may immediately terminate an employee at any point in the progressive discipline process.

The handbooks in both <u>West v. Washington Tru Solutions, LLC</u> and <u>Mealand v. Eastern New Mexico Medical Center</u> contained language that the management must or was expected to implement the progressive discipline processes, or was responsible for adherence to the policies. Neither 311 CCC policy contains similar language. If the Court found that the 311 CCC's policies -- especially the one word "justifiable" in the immediate termination policy -- created an implied contract, it would be going further than any case from the Supreme Court of New Mexico or the Court of Appeals of New Mexico has yet gone. The Court will not expand New Mexico law in a manner that the state courts have not, especially when such an expansion would, in effect, severely limit at-will employment in New Mexico, an at-will employment state.

There is no genuine issue of fact whether the practices at the 311 CCC created an implied employment contract. Although there is evidence in the record that Gonzales completed progressive disciplinary forms, <u>see</u> Gonzales Depo. at 47:6-20, 54:6-15, Gonzales did not testify that she was required to follow progressive discipline or that she always used the progressive discipline processes. In <u>Kiedrowski v. Citizens Bank</u>, the Court of Appeals of New Mexico found that there was a genuine issue of material fact whether an employer's handbook, combined with the employer's actual practices, created an expectation of an implied contract limiting the employer's right to terminate employees at will. <u>See</u> 119 N.M. at 575, 893 P.2d at 471. The Court of Appeals stated that, despite disclaimers in the defendant's handbook, the handbook contained detailed disciplinary procedures which "managers must follow when disciplining employees" and that there

was evidence that the defendant "instructed their managers to follow the disciplinary procedures outlined in the handbook."  119 N.M. at 576, 893 P.2d at 472.  In Clayton v. Vanguard Car Rental U.S.A., Inc., the Court found that there was a genuine issue of fact whether the plaintiff had a reasonable expectation that the defendant would use progressive discipline.  See 2010 WL 5476787, at *45.  The Court found there was a genuine issue of fact, in part, because of testimony in the record that the employer's supervisors were "required to follow progressive discipline," except in cases of serious offenses, and that the supervisors believed that the only instances in which they could bypass progressive discipline processes was in situations of serious offenses.  2010 WL 5476787, at *45-46.  Unlike Kiedrowski v. Citizens Bank, where the handbook indicated managers must follow progressive discipline processes and where there was evidence that the employer's practice was to instruct managers to follow the progressive disciplinary processes, and unlike Clayton v. Vanguard Car Rental U.S.A., Inc., where the handbook stated that the employer may bypass its progressive discipline processes in situations involving serious offenses, implying that they would follow progressive discipline in other situations, and there was evidence in the record that the employer's practice was that managers were required to follow progressive discipline processes, except in cases of serious offenses, in this case, there is no language in the policies that create a reasonable expectation that the at-will employment relationship was modified, and there is no evidence that the 311 CCC instructed supervisors that they had to follow or implement progressive discipline.   Although Gonzales completed progressive disciplinary forms, the progressive discipline/termination policy repeatedly states that she could have immediately terminated an employee instead of using progressive discipline or that she could have terminated the employee during the disciplinary processes.  Under the 311 CCC policy, it was Gonzales' choice whether to implement progressive discipline or whether to immediately terminate an employee.

That Gonzales chose to implement progressive discipline in certain instances does not create an issue of fact whether the 311 CCC's practices created a reasonable expectation that an employee would not be terminated absent progressive discipline.  If the Court found that an implied contract existed, it would be going further than any case from the Supreme Court of New Mexico or Court of Appeals of New Mexico has gone.  The Court therefore finds that there is no genuine issue of fact that the practices at the 311 CCC created an implied employment contract.  See Kiedrowski v. Citizens Bank, 119 N.M. at 575, 893 P.2d at 471; Clayton v. Vanguard Car Rental U.S.A., Inc., 2010 WL 5476787, at *44-45.

Because of the disclaimers, and the language giving management complete discretion whether to immediately terminate an employee or to impose progressive discipline, the Court finds that there is no genuine issue of fact whether the policies created a reasonable expectation that the 311 CCC would terminate employees only in accordance with progressive discipline processes.  The Court will therefore grant summary judgment on the Plaintiffs' breach-of-contract claim.

Even if there was a genuine issue of fact whether the policies created a reasonable expectation that the 311 CCC would terminate employees only in accordance with specified procedures, it is undisputed that, with the exception of Waites' termination, the Plaintiffs' terminations were justified.  The 311 CCC policy gives examples of offenses that constitute justifiable cause for which an employee may be terminated or disciplined.  There is no genuine issue of fact whether the City of Albuquerque breached any implied contract when it terminated Gonzales, Austin, Mora, Clover, Bordlemay, Foster, Garcia, and Pescetti, because it terminated them for offenses that it had listed in its immediate termination policy as offenses constituting justifiable cause.  There is, however, a genuine issue of material fact whether the City of Albuquerque breached any implied contract when it terminated Waites, because there is no evidence that the City

of Albuquerque terminated her for justifiable cause.  There is not a genuine issue of fact whether the City of Albuquerque breached any implied contract with Gonzales, because the City of Albuquerque terminated Gonzales because two employees submitted complaints about her, and because she hosted a charity event at the 311 CCC in the 311 CCC's name, contravening the City of Albuquerque's policies when she was told not to do so.  See Tenenbaum Depo. at 53:19-54:3, 102:21-104:14; 311 CCC Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for any justifiable cause including, . . . [m]isconduct; or . . . [v]iolation of the Personnel Rules and Regulations . . . ; or . . . [o]ther disciplinary reasons.").  There is no genuine issue of fact whether the City of Albuquerque terminated Austin without justifiable cause, because it is undisputed that Tenenbaum informed Austin that she would be considered a voluntary resignation if she did not show up for work after she exhausted all the leave to which she was entitled, and that when Austin exhausted her leave and did not return to work, the City of Albuquerque terminated her employment.  See Tenenbaum Depo. at 55:10-56:14, 91:19-93:2, 97:2-6; Austin Depo. at 16:1-25, 20:7-23:5, 22:23-23:5; 311 CCC Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for any justifiable cause including, . . . [b]eing absent from duty without proper authorization, regardless of the length of time.").  There is no genuine issue of fact whether the City of Albuquerque terminated Mora without justifiable cause, because the City of Albuquerque terminated Mora when she did not return to work after exhausting her leave.  See Tenenbaum Depo. at 60:17-22, 79:15-80:15; Amended Memorandum ¶ 27, at 6 (setting forth this fact); Response at 7 (not controverting fact); 311 CCC Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for any justifiable cause including, . . . [b]eing absent from duty without proper authorization, regardless of the length of time.").  There is no genuine issue of fact whether the City of Albuquerque terminated Clover without justifiable cause, because the City of Albuquerque

terminated Clover because of her failure to adhere to its policies, such as the attendance policies.
See Tenenbaum Depo. at 53:1-13, 114:17-25, 118:10-12; 311 CCC Procedure: Immediate
Termination at 1 ("Employees may be . . . terminated for any justifiable cause including, . . .
[m]isconduct; or . . . [b]eing absent from duty without proper authorization, regardless of the length
of time or . . . [v]iolation of the Personnel Rules and Regulations . . . ; or . . . [o]ther disciplinary
reasons.""). There is no genuine issue of material fact whether the City of Albuquerque terminated
Bordlemay without justifiable cause, because the City of Albuquerque terminated Bordlemay's
employment as a 311 CCC contact agent, because of her mishandling of a citizen call and for her
lack of respect for, or professionalism to, citizens. See Tenenbaum Depo. at 30:24-31:14; 311 CCC
Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for any justifiable cause
including, . . . [u]se of profanity, lack of respect or professionalism with Citizens or in the work area
. . . [or] [u]sing rude language or rude behavior to any Citizen."). There is no genuine issue of
material fact regarding whether the City of Albuquerque terminated Foster without justifiable cause,
because the City of Albuquerque terminated Foster's employment as a 311 CCC contact agent,
because she violated the City of Albuquerque's policy and procedures by taking personal time in
the "chill room" and by wearing earphones while at work. Foster Depo. at 5:9-19, 40:16-42:12,
47:3-5; 311 CCC Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for
any justifiable cause including, . . . [m]isconduct; or . . . [v]iolation of the Personnel Rules and
Regulations."). There is no genuine issue of material fact whether the City of Albuquerque
terminated Garcia without justifiable cause, because the City of Albuquerque terminated Garcia's
employment for performance-related issues. See Garcia Depo. at 10:11-13, 26:10-27:2; Tenenbaum
Depo. at 57:9-11 (stating that Garcia was terminated for "not meeting quality standards after being
on disciplinary action"); 311 CCC Procedure: Immediate Termination at 1 ("Employees may

be . . . terminated for any justifiable cause including, . . . [i]ncompetence, inefficiency or inadequate performance of an employee's duties."). There is no genuine issue of fact whether the City of Albuquerque terminated Pescetti without justifiable cause, because it terminated his employment as a result of his poor behavior during a phone call with a citizen. See Tenenbaum Depo. at 58:23-59:2, 131:15-24; 311 CCC Procedure: Immediate Termination at 1 ("Employees may be . . . terminated for any justifiable cause including, . . . [u]se of profanity, lack of respect or professionalism with Citizens . . . [or] [u]sing rude language or rude behavior to any Citizen."). There is a genuine issue of material fact whether the City of Albuquerque terminated Waites without justifiable cause, because the City of Albuquerque terminated Waites after she received a final written notice for tardiness, notifying her that she may be terminated if she had further incidents in the next ninety days, and she was terminated soon after receiving the final written notice. See Waites Depo. at 43:16-44:18, 58:1-14. The undisputed facts do not establish that the City of Albuquerque terminated her for justifiable cause; they do not establish the reason for her termination. Accordingly, even if the 311 CCC's policies created an implied contract, the Court would grant summary judgment on Gonzales', Austin's, Mora's, Clover's, Bordlemay's, Foster's, Garcia's, and Pescetti's breach-of-contract claims.

## IV.  THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' WRONGFUL TERMINATION CLAIMS.

The Defendants argue that the Plaintiffs' wrongful termination claims fail, because they were unclassified and as such were at-will employees. The Defendants also contend that the Plaintiffs' allegation that their terminations violate public policy is baseless, because the situation does not fit within New Mexico case law's narrow exception to the general rule that an employee is terminable at will.

The Plaintiffs contend that their terminations were in violation of public policy, because they were told that, as unclassified employees, they could receive higher pay than as classified employees, but that they had all the benefits and rights of other city employees.

"New Mexico follows the general rule that employment is terminable at will by either the employee or the employer, absent an express contract to the contrary." Zarr v. Wash. Tru Solutions, LLC, 146 N.M. at 278, 208 P.3d at 923 (citation omitted). The Plaintiffs' employment was at will, because they did not have an express contract, or, as the Court has previously found, an implied employment contract, and because the Plaintiffs were hired as unclassified employees. New Mexico has, however, recognized a public-policy exception to the common-law employment-at-will doctrine. See Vigil v. Arzola, 102 N.M. at 688, 699 P.2d at 619. Accordingly, an at-will employee may recover in tort when his discharge contravenes a clear mandate of public policy. See Chavez v. Manville Prods. Corp., 108 N.M. at 647, 777 P.2d at 375. "For an employee to recover under this . . . cause of action, he must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn." Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 303, 850 P.2d at 1006 (quoting Chavez v. Manville Prods. Corp., 108 N.M. at 647, 777 P.2d at 375; Vigil v. Arzola, 102 N.M. at 689, 699 P.2d at 620). "The employee must also show a causal connection between his actions and the retaliatory discharge by the employer." Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 303, 850 P.2d at 1006 (internal citations and footnote omitted). Whether an employee has stated a sufficient policy to recover for the tort of wrongful discharge is determined on a case-by-case basis. See Sanchez v. The New Mexican, 106 N.M. at 79, 738 P.2d at 1324; Shovelin v. Cent. N.M. Elec. Coop., 115 N.M. at 304, 850 P.2d at 1007.

The Court finds that the Plaintiffs have neither stated a sufficient policy to recover for the

tort of wrongful discharge, nor demonstrated a genuine issue of fact whether they were discharged because they performed acts that public policy would encourage or refused to do something that the City of Albuquerque required that public policy would condemn.  The Plaintiffs contend that their terminations were in violation of public policy, because they were told that, as unclassified employees, they could receive higher pay than as classified employees, but that they had all the benefits and rights of other City of Albuquerque employees.  The Court does not believe that the Plaintiffs have stated a sufficient public policy to recover for the tort of wrongful discharge.  The policy that the Plaintiffs have set forth is not analogous to the cases in which New Mexico courts have recognized a public policy sufficient to support a cause of action for retaliatory discharge, such as discharge to prevent vesting of pension benefits or discharge for reporting misuse of public funds.  See Salazar v. Furr's, Inc., 629 F. Supp. 1403 (D.N.M. 1986)(Campos, J.)(denying motion to dismiss the plaintiff's wrongful discharge claim where the plaintiff alleged that she was terminated solely to prevent vesting of her pension benefits); Vigil v. Arzola, 102 N.M. at 690, 699 P.2d at 621 (stating that the plaintiff alleged unauthorized payment of salaries and the purchase of food and liquor from federal funds, and cited the New Mexico Constitution and case law for the proposition "[t]hat misuse of public money contravenes state public policy cannot be doubted," and that "New Mexico public policy condemns not only misuse of state money, but misuse of federal money as well," and holding that, therefore, the plaintiff alleged a claim for wrongful termination).  The Court believes that the Plaintiffs' alleged public policy -- their belief that they had all the rights of other City of Albuquerque employees, which was based on misinformation or a misrepresentation -- is more analogous to cases in which courts have found that the plaintiffs did not allege a sufficient public policy, such as where the plaintiff alleged family unity as a public policy or the use of the employer's grievance procedure.  See Ellis v. El Paso Natural Gas Co., 754 F.2d 884, 885 (10th

Cir.1985)(stating that discharge for use of employer's grievance procedure did not violate public policy); Salazar v. Furr's, Inc., 629 F. Supp. at 1409 (stating that family unity is not public policy protected by retaliatory discharge cause of action); Paca v. K-Mart Corp., 108 N.M. 479, 480-81, 775 P.2d 245, 246-47 (1989)(stating that discharge for violation of company policy did not violate public policy).  The Plaintiffs' alleged public policy is "too amorphous" to state a sufficient public policy under which they can recover.  Salazar v. Furr's, Inc., 629 F. Supp. at 1409.

Furthermore, the Plaintiffs have not asserted either that the City of Albuquerque terminated them because they performed an act that public policy authorizes or would encourage, or because they refused to do something that the City of Albuquerque required that public policy would condemn.  The Plaintiffs have not established any evidence regarding any action they took or any refusal to act.  They have solely asserted that their terminations contradict what they were told.  Moreover, the Plaintiffs have not established a genuine issue of material fact regarding a causal connection between their actions involving their alleged public policy and their terminations.  The Plaintiffs cannot recover under this cause of action, because they have not established these requirements.  See Shovelin v. Cent N.M. Elec. Coop., 115 N.M. at 303, 850 P.2d at 1006.  The Court will therefore grant summary judgment on the Plaintiffs' wrongful termination claims.

## V.    THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' FMLA CLAIMS.

The Defendants argue that the Plaintiffs do not allege interference or retaliation, "the two theories under which FMLA claims may be brought."  Amended Memorandum at 18 (citation omitted).  Furthermore, the Defendants argue that the Plaintiffs' allegations do not give rise to FMLA claims.  See Amended Memorandum at 18.  The Defendants allege that the Plaintiffs received the full amount of leave to which they were entitled.  The Defendants argue that the City

-80-

of Albuquerque did not interfere with the Plaintiffs' rights under the FMLA, because the Plaintiffs

took all the leave to which they were entitled, and the City of Albuquerque was not obligated to

grant additional leave.  The Defendants also argue that the Plaintiffs presented no evidence that the

City of Albuquerque terminated their employment because they chose to exercise their FMLA

rights, and thus cannot show retaliation.

The Plaintiffs argue that the Court should not grant summary judgment on the Plaintiffs'

FMLA claims.  The Plaintiffs assert that there are genuine issues of material fact regarding the

Plaintiffs' FMLA leave that preclude summary judgment.

The FMLA entitles qualifying employees to a total of twelve administrative weeks of leave

during any twelve-month period under certain specified circumstances, including instances where

a serious health condition makes an employee unable to perform the functions of the employee's

position, where the employee has given birth or has adopted a son or daughter, or where the

employee's spouse, son, daughter, or parent has a serious health condition and needs the employee

to care for him or her.  See 29 U.S.C. § 2612(a)(1); Metzler v. Fed. Home Loan Bank of Topeka,

464 F.3d at 1180 ("The FMLA guarantees the substantive rights of up to twelve weeks of unpaid

leave for eligible employees of covered employers for serious health conditions and reinstatement

to the former position or an equivalent one upon return from that leave.").

The FMLA states that it "shall be unlawful for any employer to interfere with, restrain, or

deny the exercise of or the attempt to exercise, any right provided under this subchapter," and that

"[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against

any individual for opposing any practice made unlawful by this subchapter."   29 U.S.C. §

2615(a)(1), (2).  The Tenth Circuit has "recognized two theories of recovery under § 2615(a): an

entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination

theory arising from § 2615(a)(2)."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1170

(citation omitted).  "The distinction between these two theories is important because the elements

and burdens of proof that apply to § 2615(a)(1) claims differ from those that apply to § 2615(a)(2)

claims."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1170 (citation omitted).

Because the Plaintiffs do not indicate upon which theory they rely in their Complaint, see

Complaint ¶¶ 43-44, at 10 ("[S]ome of the Plaintiffs have been denied their rights and entitlements

under the Family and Medical Leave Act and Defendants are liable for damages and relief set out

in the law."), the Court will consider whether the Plaintiffs have established a genuine issue of

material fact under either theory.

### A.    THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' FMLA RETALIATION CLAIMS.

Courts analyze FMLA retaliation claims under the analytical framework set forth in

McDonnell Douglas Corp. v. Green.  See Richmond v. ONEOK, Inc., 120 F.3d at 208 (citation

omitted).  "Under that standard, the plaintiff initially must establish a prima facie case."  Richmond

v. ONEOK, Inc., 120 F.3d at 208 (citation omitted).  To establish a prima-facie case for FMLA

retaliation, a plaintiff must show that: (i) he or she engaged in activity protected under the act; (ii)

the employer took an action "that a reasonable employee would have found materially adverse;" and

(iii) a causal connection exists between the protected activity and the adverse action.  Metzler v. Fed.

Home Loan Bank of Topeka, 464 F.3d at 1171.  "The burden then shifts to the employer to offer a

legitimate non-retaliatory reason for the plaintiff's termination."  Richmond v. ONEOK, Inc., 120

F.3d at 208 (citation omitted).  "If the employer offers such a reason, the burden then shifts back to

the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's

proffered reason for the challenged action is pretextual."  See Richmond v. ONEOK, Inc., 120 F.3d

at 208 (citations and internal quotation marks omitted).  "A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's . . . reasons for its action, which a reasonable factfinder could rationally find . . . unworthy of credence." Richmond v. ONEOK, Inc., 120 F.3d at 209 (citation and internal quotation marks omitted).  "Mere conjecture that the employer's reason is pretext, however, will not defeat a motion for summary judgment."   See Richmond v. ONEOK, Inc., 120 F.3d at 209 (citation omitted).

### 1.    The Court Grants Summary Judgment on Gonzales' FMLA Claim.

The Court will grant summary judgment on Gonzales' FMLA claim.  The Court finds that Gonzales has not established a prima-facie case of retaliation, because she cannot establish a causal connection between the adverse action and her exercise of a protected right under the FMLA. Gonzales has established the first element of a prima-facie case.  The undisputed facts establish that, during her tenure, Gonzales was placed on intermittent FMLA.  See Tenenbaum Depo. at 99:4-7; Amended Memorandum ¶ 21, at 5 (setting forth this fact); Response at 5-6 (not controverting this fact).  There is evidence that Gonzales took leave from work for as a result of a work-related wrist injury in May, July, and August of 2008; however, the Court has not found evidence in the record which establishes that the leave Gonzales took was FMLA leave or that she requested additional FMLA leave.  See Gonzales Aff. ¶¶ 18-20, at 4 (stating that she suffered a work-related injury and had surgery in May 2008 and July 2008, and that she returned to work in August 2008, but not stating that she used FMLA leave).[21]  There is thus evidence in the record that Gonzales engaged

---

[21] Because the Defendants had an opportunity to dispute the assertions in Gonzales' affidavit, the Court will treat the undisputed assertions as undisputed facts.  The Court will treat the assertions in the other Plaintiffs' affidavits in the same manner.

in a protected activity -- taking FMLA leave -- but the evidence in the record does not make clear when she took the leave.  The Court finds that Gonzales has established the second element of a prima-facie case.  Gonzales suffered an action that a reasonable employee would have found materially adverse -- namely, her termination.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171 ("[A]ny reasonable employee would have found termination materially adverse.").

The Court finds that Gonzales has not established a causal connection between the adverse employment decision and her exercise of a protected right under the FMLA, because the dates of Gonzales' intermittent FMLA leave are not before the Court, and because the evidence does not establish that the leave that Gonzales took in May, July, and August 2008 was FMLA leave.  The undisputed facts establish that the City of Albuquerque terminated Gonzales on September 12, 2008. See Gonzales Depo. at 11:15-19; Amended Memorandum ¶ 10, at 3 (setting forth this fact); Response at 5 (not controverting this fact); Gonzales Aff. ¶ 19, at 4.  The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection" -- the third element of a prima-facie case of retaliation.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)).  The Tenth Circuit has emphasized "that a plaintiff may rely on temporal proximity alone only if 'the termination is very closely connected in time to the protected activity.'"  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171 (quoting Anderson v. Coors Brewing, 181 F.3d 1171, 1179 (10th Cir.1999))(emphasis in original).  "[A] one and one-half month period between the protected activity and the adverse action may, by itself, establish causation . . . [but] a period of three months between the protected activity and the adverse action, standing alone, is not sufficient to establish causation."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172.  Compare Ramirez v. Okla. Dept. of Mental Health, 41 F.3d 584, 596

(10th Cir. 1994)(stating that there was circumstantial evidence of retaliatory motive to withstand summary judgment when the adverse actions were taken a month and a half after the plaintiffs' protected activity), overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186 (10th Cir. 1998), with Richmond v. ONEOK, Inc., 120 F.3d at 209 (finding that the plaintiff did not establish a causal connection for her retaliation claim when there was a three-month period between the protected activity and her termination).  Because there is no evidence when Gonzales took her intermittent FMLA leave, there is not evidence through which Gonzales can establish a causal connection through temporal proximity.  Because Gonzales has not directed the Court's attention to other evidence, and because the Court has not found other evidence in the record, which would establish a causal connection, the Court finds that Gonzales has not demonstrated the third element of a prima-facie case of FMLA retaliation; therefore, Gonzales has not established a prima-facie case.

If there was evidence in the record that the leave which Gonzales took in May, July, and August of 2008 was FMLA leave, there would be sufficient evidence in the record to establish a causal connection.  Gonzales returned to work on August 18, 2008 and was terminated on September 12, 2008.  See Gonzales Aff. ¶ 19, at 4.  Because use of FMLA leave is a protected action under the FMLA, Gonzales' termination would have been approximately a month after her exercise of a protected right under the FMLA, if she indeed took FMLA leave.  A period of approximately a month between the protected activity and the adverse action can, by itself, establish causation.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172 (stating that the employee's termination "occurred at most about 6 weeks" after her employer knew she "intended to engage in protected activity and within as little as four weeks" of her request for FMLA-protected leave" and finding that, because "her termination was . . . very closely connected in time to her protected

-85-

FMLA activity, she has established the third . . . element of her prima facie case." (internal quotation marks and citation omitted)).

Even if Gonzales has established a prima-facie case of retaliation, however, the Court would grant summary judgement on her FMLA claim.  The Defendants have set forth a legitimate, nondiscriminatory reason for her termination.  The Defendants state the City of Albuquerque terminated Gonzales because two employees submitted complaints about her, and because she hosted a charity even in contravention of the City of Albuquerque's policies and when she was told not to do so.  "Because these reasons are not facially prohibited," the Court finds that the Defendants "articulated a legitimate, non-retaliatory reason for terminating [Gonzales'] employment."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172.  To defeat summary judgment, Gonzales must show pretext.  Gonzales solely relies on her assertion in her affidavit that she believes Tenenbaum terminated her to avoid Workers' Compensation liability.  See Gonzales Aff. ¶ 20, at 4.  Because Gonzales' assertion is not based upon personal knowledge, and is conjecture, the Court will not consider this assertion as evidence that shows that the Defendants' reason for termination is pretextual.  See Richmond v. ONEOK, Inc., 120 F.3d at 209 ( "Mere conjecture that the employer's reason is pretext, however, will not defeat a motion for summary judgment." (citation omitted)).  Gonzales must present evidence of temporal proximity "plus circumstantial evidence of retaliatory motive" to raise an issue of fact as to pretext.  Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x 744, 750 (10th Cir. 2009)(emphasis in original)(citing Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172)).[22]  Because Gonzales has presented no circumstantial evidence in

---

[22] Although  a plaintiff may rely on temporal proximity alone to establish a causal connection -- the third requirement of a prima-facie case -- if the termination is very closely connected in time to the protected activity, the Tenth Circuit has repeatedly recognized that, to show pretext, evidence of temporal proximity is not sufficient.  See Nealy v. Water Dist. No. 1 of Johnson County, 324 F.

addition to possible evidence of temporal proximity to show that the Defendants' asserted legitimate reason is pretextual, the Court will grant summary judgment on Gonzales' FMLA claim. See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1179-80 ("Without evidence to demonstrate that [the employer's] given reasons for terminating [the plaintiff] are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [the employer] did not act for those reasons, we conclude that [the plaintiff] . . . failed to meet her burden to demonstrate pretext." (internal citation omitted)).

### 2.      The Court Grants Summary Judgment on Austin's FMLA Claim.

The Court will grant summary judgment on Austin's FMLA claim.  Austin requested FMLA leave in October 2007.  See Austin Depo. at 11:3-12:14.  Because requesting leave is a protected activity, see Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x at 750, the Court finds that Austin established the first element of a prima-facie case.  Austin has also established the second element of a prima-facie case, because she was terminated.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171.  Austin requested placement on medical leave in October 2007, see Austin Depo. at 11:3-12:14, and in January 2008, she requested time off without pay, but the City of Albuquerque did not terminate her until the end of January 2008, see Austin Aff. ¶¶ 6-10,

_____

App'x at 750 ("'To raise a fact issue of pretext,' Ms. Nealey must 'present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.'  '[T]his court has refused to allow even very close temporal proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext.'" (quoting Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172)(emphasis in original)); Burris v. Novartis Animal Health U.S., Inc., 309 F. App'x 241, 244 (2009)("'To raise a fact issue of pretext, [Mr. Burris] must . . . present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.'" (citation omitted)); Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1290 (10th Cir. 2007)("Taking these in turn, we have never allowed even very close temporal proximity [taken alone] to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext.  Rather, to show pretext Campbell must . . . present evidence of temporal proximity plus circumstantial evidence of retaliatory motive." (citation and internal quotation marks omitted)).

at 2-4.  It is unclear whether the request for unpaid leave was an additional FMLA request.  The FMLA states that leave granted under the Act "may consist of unpaid leave."  29 U.S.C. § 2612(c).  If Austin's additional request was not a request for FMLA leave, then approximately three months passed between her FMLA request and the adverse action, which, standing alone is not sufficient to establish causation.  See Richmond v. ONEOK, Inc., 120 F.3d at 209.  Austin, therefore, would not have established a prima-facie case.  If, however, Austin's additional request for leave in January 2008 was a request for FMLA leave, Austin's termination was "very closely connected in time" to her protected FMLA activity -- the two events occurred in the same month -- and she would have established the third element of her prima-facie case, thereby establishing a prima-facie case.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172.

Even if Austin has established a prima-facie case of retaliation, however, the Court would grant summary judgement on her FMLA claim.  The City of Albuquerque has offered a legitimate, non-retaliatory reason for Austin's termination.  The City of Albuquerque has stated that, when Austin first requested FMLA leave, it told her that she had 47 hours of leave remaining, and that, pursuant to the City of Albuquerque's policies, she would be considered a voluntary resignation if she did not show up for work after exhausting all the leave to which she was entitled.  The City of Albuquerque states that it terminated Austin after she exhausted her leave and did not return to work.  The Court finds that Austin has not demonstrated that there is an issue of fact whether the City of Albuquerque's proffered reason is pretextual.  To raise an issue of fact as to pretext, Austin must present evidence of temporal proximity "plus circumstantial evidence of retaliatory motive." Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x at 750(emphasis in original)(citation omitted).  Austin has not directed the Court's attention to any evidence in the record raising a factual issue of pretext.  The Court has not found any evidence in the record, other than evidence of possible

temporal proximity, raising a factual issue of pretext.  Because evidence of temporal proximity, by itself, is not sufficient to create an issue of fact as to pretext, the Court finds that there is no genuine issue of fact whether the City of Albuquerque's proffered reason is pretextual.  The Court therefore will grant summary judgment on Austin's FMLA claim.

###    3.    The Court Grants Summary Judgment on Mora's FMLA Claim.

The Court will grant summary judgment on Mora's FMLA claim.  The Court finds that Mora has established a prima-facie case of retaliation.  During her tenure, Mora requested and was granted a leave of absence, and she exhausted 960 hours during leave.  See, e.g., Mora Depo. at 18:8-14; Amended Memorandum ¶ 26, at 6 (setting forth this fact); Response at 7 (not controverting fact).  Because Mora exercised her right under the FMLA to take leave, the Court finds that Mora has established the first element of a prima-facie case.  The Court also finds that Mora has established the second element of a prima-facie case, because she was terminated, which is an action a reasonable employee would find materially adverse.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171.  The parties have not provided the Court with facts regarding when Mora exhausted her leave or when she was terminated.  The undisputed facts solely establish that the City of Albuquerque sent Mora a letter advising her she had exhausted this leave, see, e.g., Mora Depo. at 22:5-23:11; Amended Memorandum ¶ 26, at 6 (setting forth this fact); Response at 7 (not controverting this fact), that Mora did not return to work after exhausting her leave, and that, consequently, the City of Albuquerque treated her as a voluntary resignation under its policies and procedures, see Tenenbaum Depo. at 60:17-22, 79:15-80:15; Amended Memorandum ¶ 27, at 6 (setting forth this fact); Response at 7 (not controverting this fact).  There are therefore no facts upon which the Court can determine whether Mora's termination was "very closely connected in time" to her protected activity.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171-72.  The

Court may infer that Mora's termination was close in time to her exhaustion of her leave, but, without specific dates, the Court cannot determine whether the adverse action was very closely connected in time to her protected activity.  The Court therefore finds that Mora has not established the third element of a prima-facie case.

Even if Mora could establish a prima-facie case of retaliation, however, the Court would grant summary judgement on her FMLA claim.  The City of Albuquerque states that it treated her as a voluntary resignation under its policies and procedures, because she did not return to work after exhausting her leave.  The City of Albuquerque has therefore offered a legitimate, nonretaliatory reason for her termination.  Mora must present evidence of temporal proximity "plus circumstantial evidence of retaliatory motive" to raise an issue of fact as to pretext.  Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x at 750 (emphasis in original)(citation omitted).  Because Mora has not directed the Court's attention to evidence in the record that creates a genuine issue of material fact whether this explanation is pretextual, and because the Court cannot find evidence in the record, other than evidence indicating temporal proximity, that creates an issue of fact as to pretext, the Court will grant summary judgment on Mora's FMLA claim.

### 4. The Court Grants Summary Judgment on Clover's FMLA Claim.

The Court will grant summary judgment on Clover's FMLA claim.  The Court finds that Clover has established a prima-facie case of retaliation.  On December 19, 2006, Clover went on maternity leave, and eventually returned to a full-time schedule in late May or June when she had exhausted her FMLA leave.  See Clover Depo. at 32:10-15; Amended Memorandum ¶ 29, at 6 (setting forth this fact); Response at 7 (not controverting this fact).  Because Clover exercised her right under the FMLA to take leave, the Court finds that Clover has established the first element of a prima-facie case of retaliation -- that she engaged in a protected activity.  The Court also finds that

Clover has established the second element of a prima-facie case, because she was terminated, which is an action a reasonable employee would find materially adverse. See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171. The City of Albuquerque terminated Clover on July 20, 2009. See Clover Aff. ¶ 9, at 3. The termination was approximately one and one-half months after Clover returned from exercising her right under the FMLA to take leave. Because the Tenth Circuit has recognized that a period of a month and one half can, by itself, establish a causal connection, see Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1172, the Court finds that Clover has established the third element of a prima-facie case.

Although Clover has established a prima-facie case of FMLA retaliation, the Court will grant summary judgment on her claim, because the City of Albuquerque has proffered a legitimate reason for her termination and she has not demonstrated a genuine issue of material fact that the proffered reason is pretextual. The City of Albuquerque states that it terminated Clover for her failure to adhere to the City of Albuquerque's policies after placing her on a progressive discipline plan. Clover must present evidence of temporal proximity "plus circumstantial evidence of retaliatory motive" to raise an issue of fact as to pretext. Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x at 750 (emphasis in original)(citation omitted). The only evidence Clover has offered in support of her contention that the City of Albuquerque's reason is pretextual is her assertion in her affidavit that she believes she was terminated because she used her leave. Because Clover's assertion is not based upon personal knowledge, and is mere conjecture, the Court will not consider this assertion as evidence that the Defendants' reason for termination is pretextual. See Richmond v. ONEOK, Inc., 120 F.3d at 209 ("Mere conjecture that the employer's reason is pretext, however, will not defeat a motion for summary judgment." (citation omitted)). Because Clover has presented no evidence, other than evidence of temporal proximity, to show that the Defendants' asserted

legitimate reason is pretextual, the Court will grant summary judgment on Clover's FMLA claim.

**5.      The Court Grants Summary Judgment on Pescetti's FMLA Claim.**

The Court will grant summary judgment on Pescetti's FMLA claim.  The Court finds that Pescetti has not established a prima-facie case of FMLA retaliation.  There is evidence in the record that Pescetti used FMLA leave.  See Pescetti Aff. ¶ 11, at 3.  Because Pescetti exercised his right under the FMLA to take leave, the Court finds that Pescetti has established the first element of a prima-facie case of retaliation -- that he engaged in a protected activity.  The Court also finds that Pescetti has established the second element of a prima-facie case, because he was terminated, which is an action a reasonable employee would find materially adverse.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171.  Pescetti states that he was on FMLA leave and had used up all of his leave time as of May 16, 2008.  See Pescetti Aff. ¶ 11, at 3.  Pescetti does not produce evidence, nor does the evidence in the record show, when Pescetti exercised his right to use FMLA leave.  The City of Albuquerque terminated Pescetti on May 16, 2008.  See Tenenbaum Depo. at 58:23-59:2, 131:15-24.  There are therefore no facts upon which the Court can determine whether Pescetti's termination was "very closely connected in time" to his protected activity.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171-72.  The Court may infer that Pescetti's's termination was close in time to his exhaustion of his leave, but without specific dates the Court cannot determine whether the adverse action was "very closely connected in time" to her protected activity.  The Court therefore finds that Pescetti has not established the third element of a prima-facie case.

Even if Pescetti could establish a prima-facie case of retaliation, however, the Court would grant summary judgement on her FMLA claim.  The City of Albuquerque has proffered a legitimate non-retaliatory explanation for terminating Pescetti.  The City of Albuquerque states that it terminated Pescetti's employment as a contract agent, because of his poor behavior during a

telephone call with a citizen.  See Tenenbaum Depo. at 58:23-59:2, 131:15-24.  Pescetti must present evidence of temporal proximity "plus circumstantial evidence of retaliatory motive" to raise an issue of fact as to pretext.  Nealey v. Water Dist. No. 1 of Johnson County, 324 F. App'x at 750 (emphasis in original)(citation omitted).  Because Pescetti has not directed the Court's attention to evidence in the record that creates a genuine issue of material fact whether this explanation is pretextual, and because the Court cannot find evidence in the record, other than evidence indicating temporal proximity, that creates an issue of fact as to pretext, the Court will grant summary judgment on Pescetti's FMLA claim.

> **6.      The Court Grants Summary Judgment on Garcia's FMLA Claim.**

The Court will grant summary judgment on Garcia's FMLA claim.  Garcia cannot establish a prima-facie case of FMLA retaliation.  In her affidavit, Garcia alleges that she filled out FMLA paperwork and was later notified that she needed to fill out new paperwork.  See Garcia Aff. ¶ 12, at 3-4.  Garcia never alleges that she turned in the new paperwork and elected to take FMLA leave. Garcia also does not allege that she was on FMLA leave in her affidavit; she states only that she was out sick.  See Garcia Aff. ¶ 13, at 4.  The Court therefore finds that Garcia has not established that she engaged in a protected activity -- the first element of a prima-facie retaliation claim -- because she has not established that she filled out the appropriate paperwork and elected to take FMLA leave.  See Ney v. City of Hoisington, Kan., 508 F. Supp. 2d 877, 887 (D. Kan. 2007)("[T]his Court is unable to find that a genuine issue of material fact exists . . . regard[ing] . . .the first element of plaintiff's prima facie case.  [I]n order for a plaintiff to 'avail' herself of the FMLA, she must fill out the appropriate paperwork and actually elect to take such leave.").  If Garcia could establish that she engaged in a protected activity, she has established the second requirement of a prima-facie case, because she was terminated, which is an action a reasonable employee would find materially

adverse.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171.  If Garcia was engaged in a protected activity, her attempts to seek FMLA leave were in the middle of July.  Garcia was terminated in the beginning of September.  The adverse action, taken approximately six weeks after the protected activity, is sufficient, standing along, to show causation.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1171-72.

Even if Garcia could establish a prima-facie case, however, the City of Albuquerque has offered a legitimate non-retaliatory reason for her termination, and there is no genuine issue of material fact as to pretext.  The City of Albuquerque has stated that it terminated Garcia for performance-related issues.  Garcia has not directed the Court's attention to evidence, and the Court has found no evidence, other than evidence of temporal proximity, that creates a genuine issue of material fact that this reason is pretextual.  The Court will therefore grant summary judgment on Garcia's claim under the FMLA.

### B.   THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' FMLA INTERFERENCE CLAIMS.

To prevail on an interference theory, a plaintiff must demonstrate that: (i) he or she was entitled to FMLA leave, (ii) "some adverse action by the employer interfered with his [or her] right to take FMLA leave;" and (iii) "the employer's action was related to the exercise or attempted exercise of his [or her] FMLA rights."  Jones v. Denver Pub. Schs., 427 F.3d at 1319 (citation omitted).  "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, and the McDonnell Douglas burden-shifting analysis does not apply to interference claims."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1180 (internal citation omitted).

Section 2615(a)(1) is nevertheless not a strict liability statute.  See 29 U.S.C. § 2614(a)(3)(B)("Nothing in this section shall be construed to entitle any restored

employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); see also Smith[v. Diffee Ford-Lincoln-Mercury, Inc.], 298 F.3d [955,] 960 [(10th Cir. 2002)]("[A]n employee who requests FMLA leave would have no greater protections against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request.") (quotations omitted). Thus, "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave [or reinstatement after leave] . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." Smith, 298 F.3d at 961 (citing Gunnell[v. Utah Valley State Coll.], 152 F.3d [1164,] 1262[(10th Cir. 2006)]). The burden to demonstrate that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave" is on the defendant-employer. Id. at 963; see also 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d at 1180. "In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." Campbell v. Gambro Healthcare, Inc., 478 F.3d at 1287.

The Defendants argue that the Plaintiffs took all the leave to which they were entitled under the FMLA, and, as such, the City of Albuquerque did not interfere with the Plaintiffs' rights under the FMLA. The Plaintiffs have not directed the Court's attention to any evidence in the record that the Defendants interfered with their rights to take FMLA leave. In her affidavit, Garcia discusses her FMLA time expiring. See Garcia Aff. ¶ 12, at 3. Pescetti states that he had used all of his FMLA time as of May 16, 2008. See Pescetti Aff. ¶ 11, at 3. Clover returned to work after using her FMLA time for maternity leave. See Clover Aff. ¶ 10, at 3. Mora exhausted her leave time. See Mora Depo. at 18:8-14; Amended Memorandum ¶ 26, at 6 (setting forth this fact); Response at 7 (not controverting fact). Austin also exhausted her FMLA leave. See Austin Depo. at 16:1-25,

-95-

20:7-23:5.  Gonzales used FMLA leave intermittently throughout her tenure at 311 CCC and took leave in the months preceding her termination.  See Gonzales Aff. ¶¶ 18-19, at 4.  The Court finds that the Plaintiffs' FMLA interference claims fail, because they cannot establish that the City of Albuquerque interfered with their right to take FMLA leave.  Cf. Lloyd v. Washington & Jefferson Coll., 288 F. App'x 786, 789 (3d Cir. 2008)(stating that the defendant could not have interfered with the plaintiff's right to take FMLA leave when the plaintiffs "exhausted any leave to which he might have been entitled").  Because the Plaintiffs have failed to set forth evidence that shows that the Defendants interfered with their right to take FMLA leave -- instead, it appears that each Plaintiff was allowed to take FMLA leave -- the Court will grant summary judgment on the Plaintiffs' FMLA interference claims.

## VI.  THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON GONZALES' FLSA CLAIM.

The Defendants contend that Gonzales falls within the executive exemption to the FLSA overtime requirements.  The Defendants state that Gonzales has conceded that she made more than $455.00 a week and that she directed the work of more than two employees.  The Defendants further argue that, as supervisor, Gonzales was charged with the responsibility of functioning as a shift leader for a team of agents, and that these management duties were her primary or most important duties.  The Defendants assert that she interviewed agents and, as such was involved in the hiring process, and that she was responsible for making recommendations regarding whether to terminate or otherwise discipline employees.

The Plaintiffs contend that the Defendants have not met their burden of proving that Gonzales falls within the executive exemption.  See Aaron v. City of Wichita, Kan., 54 F.3d at 657 ("Exemptions to the FLSA are to be narrowly construed; the employer must show that the employee

-96-

fits 'plainly and unmistakenly within the exemption's terms' . . . ." (citation omitted)).  The Plaintiffs contend that, as a supervisor, Gonzales routinely spent at least three quarters of her time answering telephones -- which is what an agent does.  The Plaintiffs also contend that Tenenbaum did all the hiring and firing, generally without consulting a supervisor, and that Gonzales almost never exercised any judgment or discretion about any important matter.  Gonzales contends that she did not have authority to approve or authorize overtime work or absences from work, and had no role in hiring or firing employees, or in recommending their hiring or firing.

Gonzales argues that she was wrongfully classified as exempt and estimates that, in the three years before filing the lawsuit, she worked at least 3,000 hours of overtime at the 311 CCC.  See Gonzales Aff. ¶ 24, at 4.  The FLSA requires covered employers to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week.  See 29 U.S.C. § 207.  The FLSA exempts individuals "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  "The employer has the burden of showing that its employees are exempt from the FLSA's overtime provisions."  See Aaron v. City of Wichita, Kan., 54 F.3d at 657 (citing Corning Glass Works v. Brennan, 417 U.S. at 196-97).  "An employee must fit 'plainly and unmistakenly within the exemption's terms,' and the FLSA exemptions are to be narrowly construed."  Hays v. City of Pauls Valley, 74 F.3d at 1006 (citing Aaron v. City of Wichita, 54 F.3d at 657 (citation omitted).

The Code of Federal Regulations provides:

(a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

To be an exempt employee, the employee must be salaried at a rate of more than $455.00 a week.  It is undisputed that, as a supervisor, Gonzales was a salaried employee and that her salary was approximately $45,000.00 when she began and $50,000.00 when she was terminated.  Gonzales was therefore compensated on a salary basis at more than $455.00 a week, and the Court finds that she meets this requirement.

The Court also finds that Gonzales' primary duty was management of a subdivision of the 311 CCC.  "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).  In evaluating an employee's primary duty, a court must base its determination on all the facts in the case, "with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The court should consider the importance of the exempt duties "as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" when determining the employee's primary duty.  29 C.F.R. § 541.700(a).  The amount of time the employee spends performing exempt work can be a useful guide "in determining whether exempt work is the primary duty of an employee."  29 C.F.R.

§ 541.700(b).  "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b).  Time, by itself, however, is not the only test, and there is no requirement that "exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  29 C.F.R. § 541.700(b).

> The Code of Federal Regulations has elaborated on the meaning of the term "management."
>
> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Gonzales performed duties which fall within the definition of the term "management" of a subdivision in the 311 CCC.  At the 311 CCC, supervisors, such as Gonzales, supervised teams of employees.  As a supervisor, Gonzales was responsible for the performance of a team of contact agent employees.  She attended management training that discussed the supervisory responsibilities in managing her team.  As a supervisor, her work station was on a raised area overlooking the contact agents.  Gonzales monitored her employees' calls and counseled them on how to best handle the calls.  See C.F.R. § 541.102 (stating that the term management includes "directing the work of employees" and "determining the techniques to be used").  Gonzales reviewed call action and

development plans with her employees based on their performance, see C.F.R. § 541.102 (stating that the term management includes maintaining records for use in supervision of the employees), and completed progressive disciplinary forms in situations involving employee infractions, see C.F.R. § 541.102 (stating that management includes "disciplining employees").  Because these activities are analogous to the activities listed as management activities in the Code of Federal Regulations, the Court finds that the evidence in the record that, and there is not a genuine issue of material fact whether, Gonzales performed some management activities in her position as supervisor.

The Court finds that there is not a genuine issue of material fact whether Gonzales' primary duty was management.  In her affidavit, Gonzales asserted that, "[a]s a supervisor[,] I was still required to take citizen calls, and the other supervisors and I routinely spent at least three quarters . . . of our time answering phones just as we had when we were contact agents."  Gonzales Aff. ¶ 6, at 2.  Although the Plaintiffs did not assert this statement as an additional undisputed fact, the Plaintiffs relied on this assertion in their Response, and the Defendants addressed this assertion in their Reply.  In their Reply, the Defendants asserted evidence that they argue shows that exempt supervisors, including Gonzales, answered less than 10% of the volume of calls that non-exempt 311 CCC employees answered.  See Declaration of Esther Tenenbaum ¶¶ 3-4, at 1 (executed October 13, 2010), filed October 15, 2010 (Doc. 79-3); Spreadsheet at 1, filed October 15, 2010 (Doc. 79-3)(compiling data on telephone calls for the period of September 2007 to September 2008).  Because of the conflicting evidence regarding the amount of time that Gonzales spent answering telephone calls as a supervisor, the Court will treat Gonzales' statement as a disputed fact.  Although the amount of time that Gonzales spent performing exempt work is disputed, time is but one of the factors, and "[e]mployees who do not spend more than 50 percent of their time performing exempt

duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  29 C.F.R. § 541.700(b).

The Court will also consider Gonzales' "relative freedom from direct supervision; and the relationship between [her] salary and the wages paid to other employees for the kind of nonexempt work [she] performed" when determining Gonzales' primary duty.  29 C.F.R. § 541.700(a). Gonzales was responsible for the performance of a team of contact agent employees.  She reviewed call action and development plans with her employees based on their performance, and completed progressive disciplinary forms.  As a supervisor, Gonzales made approximately $45,000.00 when she was promoted and $50,000.00 when she was terminated, as compared to her annual salary of approximately $35,360.00 as a contact agent.  There is nothing in the record to suggest Gonzales was either closely supervised or relatively free from direct supervision.  Although the amount of time that Gonzales spent answering telephones is disputed, even if the Court takes the evidence in the light most favorable to Gonzales -- that she spent three quarters of her time answering calls -- time spent is but one factor.  It appears that Gonzales' responsibility for the performance of her team was more important that answering telephone calls.  Furthermore, Gonzales' salary as a supervisor was a significant amount more than her salary as a contact agent, and, presumably, the salaries of other contact agents.  The Code of Federal Regulations sets forth an example of an employee whose primary duty is the management of the enterprise.

> [F]or example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register.

29 C.F.R. § 541.700(c).  The Court believes that this example is analogous to the situation in this

case, where, taking the evidence in the light most favorable to Gonzales, although Gonzales spent more than fifty percent of her time performing nonexempt work -- answering calls -- she also supervised and directed the work of contact agents in her team, she reviewed call action and development plans with her employees based on their performance, and she completed disciplinary forms if her employees committed infractions.  The Court therefore finds that there is not a genuine issue of material fact that Gonzales' primary duty was management.

It is undisputed that, as a supervisor, Gonzales supervised approximately ten to fifteen employees when she worked the day shift and three to four people when she worked the graveyard shift.  To qualify for the executive exemption, the employee must "customarily and regularly direct the work of two or more other employees."  29 C.F.R. § 541.100.  The terms "customarily" and "regularly" mean "a frequency that must be greater than occasional."  29 C.F.R. § 541.701.  Because the undisputed facts establish that Gonzales customarily supervised more than two employees, the Court finds that Gonzales meets this requirement.

The final requirement is that the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100.

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.  Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs.  It does not include an occasional suggestion with regard to the change in status of a co-worker.  An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

-102-

29 C.F.R. § 541.105.  Gonzales participated in interviewing agents.  She also reviewed call action and development plans with her employees based on their performance and completed progressive disciplinary forms, which were considered when disciplining employees.  Taking the facts in the light most favorable to Gonzales, however, Gonzales did not hire or fire employees, and did not recommend hiring or firing.  If the Court considers the facts in the light most favorable to Gonzales, it appears that Gonzales did not have the authority to hire or fire employees.  An employee might still meet this requirement, however, if his or her suggestions or recommendations as to hiring, firing, or changing another employee's status are given particular weight.  Taking the facts in the light most favorable to Gonzales, although Gonzales participated in the interview process, she did not recommend hiring employees.  Similarly, taking the facts in the light most favorable to Gonzales, although the forms that she filled out regarding the employees she supervised were considered in changing the employees status, Gonzales did not recommend changes in status.  The Court therefore finds that Gonzales has established a genuine issue of material fact whether she meets this requirement.[23]

The Court will deny the Defendants' request that it grant summary judgment on Gonzales' FLSA claim, because it finds that there is a genuine issue of fact whether Gonzales met the final requirement for the executive exemption.

---

[23] When there is a genuine issue of material fact whether an employee falls under the executive exemption, the Tenth Circuit has stated that summary judgment is inappropriate. See Aaron v. City of Wichita, Kan., 54 F.3d at 654, 659 (reversing the district court's grant of summary judgment that the employer erred by exempting certain employees from FLSA overtime requirements, because there was a genuine issue of material fact whether the employees fit within the executive exemption).  When summary judgment is inappropriate, because there is a genuine issue of material fact, a jury should decide the issue.  See Stanton v. Gilbert W. Corp., 61 F.3d 916, at *2 (10th Cir. 1995).

## VII.   THE COURT WILL NOT GRANT THE PLAINTIFFS' REQUEST FOR DECLARATORY JUDGMENT.

The Defendants argue that the Plaintiffs are not entitled to a declaratory judgment, because, to the extent they allege they were wrongly designated as unclassified employees, their argument fails, because they were at all times unclassified employees with no expectation of continued employment.   The Plaintiffs allege that they seek declaratory judgment on the issue whether they have a reasonable expectation of continued employment such that they have a property interest in their employment.

The Declaratory Judgment Act states:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  " By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995).  Because the Plaintiffs seek declaratory judgment on the issue whether they had a property interest in their employment, and because the Court has found that the Plaintiffs did not have protected property interests in continued employment, the Court will deny the Plaintiffs' request for declaratory judgment, because it finds that the Plaintiffs did not have property interests in their employment. The Court will therefore grant summary judgment on the Plaintiffs' declaratory judgment claims.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment, filed June 6, 2010 (Doc. 56) is granted in part and denied in part.  The Court grants summary judgment in favor of the Defendants and against the Plaintiffs on all of the Plaintiffs' claims, except for Plaintiff Antoinette

Gonzales' claim under the Fair Labor Standards Act, 29 U.S.C. §§ 201 through 219.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Paul Livingston
Placitas, New Mexico

      *Attorney for the Plaintiffs*

Robert J. Perry
  City Attorney
Michael I. Garcia
  City of Albuquerque Legal Department
The City of Albuquerque
Albuquerque, New Mexico

-- and --

Edward W. Bergmann
Seyfarth Shaw LLP
Chicago, Illinois

      *Attorneys for the Defendants*